[L.A. No. 29882. In Bank. May 10, 1972.]

SUNSET AMUSEMENT CO. et al., Plaintiffs and Appellants, v. BOARD OF POLICE COMMISSIONERS OF THE CITY OF LOS ANGELES, Defendant and Respondent.

68

**COUNSEL**

Arnold H. Gold for Plaintiffs and Appellants.

Roger Arnebergh, City Attorney, George J. Franscell, Assistant City Attorney, Thomas M. Dempsey and Kurt S. Seifert, Deputy City Attorneys, for Defendant and Respondent.

## Opinion

BURKE, J.—Petitioners are the owners and operators of the Hollywood Rollerbowl, a roller skating rink operating within the City of Los Angeles since 1955. At issue is the question whether respondent Board properly denied petitioners' application for renewal of their operating permit for the years 1968 and 1969. We have concluded that the Board's decision was based upon substantial evidence, was within its powers, and should be sustained.

In November 1967 petitioners sought to renew their skating rink permit for the year 1968 by filing the requisite application for renewal with the Board, designated by municipal ordinance as the appropriate licensing agency. In October 1968, Board issued to petitioners a "notice of intention to deny permit," specifying four separate grounds therefor, including petitioners' failure to provide adequate parking facilities for their patrons and their failure to control or prevent disturbances in or near the premises. Hearings were held on the matter at various times from December 1968 to January 1969; during the pendency of these hearings petitioners applied for renewal of their permit for the year 1969. At the termination of the hearings, the examiner issued his findings and conclusions,[1] recommending that petitioners' renewal application be denied.

Thereafter, petitioners requested a transcript of the foregoing hearings and it was discovered that a portion of the transcriber's notes had been lost. Accordingly, the Board ordered new hearings limited to the testimony of those witnesses whose prior testimony had been lost, together with any additional evidence which petitioners wanted to present. The additional hearings were held in June 1969; at their conclusion, the hearing examiner reaffirmed his previous recommendation that petitioners' renewal application be denied.[2] The record of the hearings in this case comprises 15 volumes of testimony.

---

[1] The hearing examiner found "evidence that a considerable problem does exist at the rink. The lack of adequate parking causes patrons to use other private property and causes congestion in the area. The large number of persons exiting during a short time period all into the front of the rink onto Sunset has caused a considerable police problem. . . . [A]pplicant has done too little and failed to recognize the problems soon enough and the operation fails to comport with the general welfare of the public." The examiner also found that 52 letters of protest had been received, reflecting that renewal would not comport with the "peace, health, safety, convenience, good morals and general welfare of the public," that numerous arrests occurred in or near the premises, and that the operation of the premises has required numerous man-hours and police efforts to prevent and control major disturbances.

[2] Although the examiner noted that petitioners had taken additional measures to control the situation, and that the "problems" had diminished since the prior hear-

On September 10, 1969, the Board adopted the findings and conclusions of its hearing examiner. Petitioners' petition for reconsideration was granted and subsequently the Board adopted additional findings supporting further grounds[3] for denial of petitioners' 1968 renewal application. Petitioners filed a second petition for reconsideration which the Board granted; thereafter on October 15, 1969, the Board readopted its prior, expanded findings and denied both the 1968 and 1969 renewal applications.

Petitioners thereupon filed a mandamus action with the Los Angeles Superior Court to compel Board to renew their operating license. The court denied mandate[4] and petitioners appeal from that denial, asserting numerous errors.

## 1. Constitutionality of License Ordinance

At the time when petitioners submitted their original renewal application in 1967, section 103.29, subdivision (c), of the Los Angeles Municipal Code empowered the Board, after an investigation, to deny an operating permit "if the Board finds that the said operation will not comport with the peace, health, safety, convenience, good morals,[5] and general welfare of the public or that facts exist upon which a denial of such permit would be authorized pursuant to this Article." Under section 103.31, a denial of permit is authorized if the business involved is prohibited by local or state law (subd. (a)), if the business is or has become a public nuisance (subd. (b)), or if the applicant is "unfit," has a bad moral character, intemperate habits or a bad reputation for truth, honesty or integrity, is under the age of 18, has committed an act which would be ground for discipline under the article, or has been refused a permit or had a permit revoked (subd. (c)).

As noted above, the Board and its hearing officer made a specific finding that petitioners' application should be denied, among other reasons, because the granting of the permit would not comport with the "peace,

ings, nevertheless he concluded petitioners have not taken sufficient measures to insure the safety of the area and that the operation still fails to comport with the general welfare of the public.

[3]In addition to petitioners' failure to provide adequate parking facilities and to control or prevent disturbances, the Board found that petitioners violated a municipal ordinance requiring adequate parking facilities and knowingly made a false statement of a material fact in their application. The Board denied the renewal application "based on each of these adverse findings, separately considered . . . ."

[4]The trial court sustained the Board's findings in toto, except for its finding that petitioners had made a false statement in their application.

[5]In November 1968, the phrase "good morals" was deleted from the above-quoted subsection.

health, safety, convenience, good morals, and general welfare of the public." Although this general finding was supplemented by further specific findings regarding petitioners' operations, petitioners contend that the broad language of section 103.29 renders the ordinance unconstitutionally vague, furnishing insufficient standards to guide the Board's discretion in exercising its permit powers.

■ A municipality has broad power to enact "all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." (Cal. Const., art. XI, § 7.) An ordinance so enacted will ordinarily be upheld if "it is reasonably related to promoting the public health, safety, comfort, and welfare, and if the means adopted to accomplish that promotion are reasonably appropriate to the purpose. [Citations.]" (*Higgins* v. *City of Santa Monica*, 62 Cal.2d 24, 30 [41 Cal.Rptr. 9, 396 P.2d 41].) ■ The requirement that a license first be obtained before conducting a business or activity has long been recognized as a valid exercise of the police power. (*Burton* v. *Municipal Court*, 68 Cal.2d 684, 690 [68 Cal. Rptr. 721, 441 P.2d 281]; *In re Fuller*, 15 Cal.2d 425, 431 [102 P.2d 321].)

Nevertheless, where First Amendment activities are involved, this court has subjected licensing ordinances to strict scrutiny. (See *Perrine* v. *Municipal Court*, 5 Cal.3d 656, 661-663 [97 Cal.Rptr. 320, 488 P.2d 648]; *Dillon* v. *Municipal Court*, 4 Cal.3d 860, 866 [94 Cal.Rptr. 777, 484 P.2d 945]; *Burton* v. *Municipal Court, supra*, 68 Cal.2d 684, 690-697.) In *Burton*, we were faced with the validity of the same subdivision of section 103.29 (then subd. (b)) involved herein, as applied to an exhibitor of motion picture films to the public. In our analysis of the constitutionality of that subdivision we noted that "The crucial factor here is our zealous solicitude for rights falling within the protection of the First Amendment," since in that category of cases, " ' "precision of regulation must be the touchstone" ' [citations] and the standards set forth [in the ordinance] must be 'susceptible of objective measurement' [citations]." (Pp. 690-691.) We concluded that the subdivision in question here contained "overly broad standards [which] are fraught with the hazard that an applicant will be denied his rights to free speech and press through exercise of the power of the board, in its discretion, to refuse a permit because of the content of the films which the applicant exhibits in his theater." (P. 692.)

It is apparent that the rule announced in *Burton* applies only to those situations in which the operation of a licensing ordinance impinges upon the exercise of First Amendment activities, rather than ordinary commercial enterprises. (*Saunders* v. *City of Los Angeles*, 273 Cal.App.2d 407, 411 [78 Cal.Rptr. 236].) Thus, in *Daniel* v. *Board of Police Commissioners*,

190 Cal.App.2d 566, 573 [12 Cal.Rptr. 226], the court upheld section 103.29 against a claim of vagueness and lack of standards in the context of the denial of a license for premises upon which food and beverages were sold and live entertainment provided. In *Burton* v. *Municipal Court, supra,* 68 Cal.2d 684, 693, we noted that the holding in *Daniel* was "not necessarily in conflict with the views we express" since the *Daniel* opinion "does not discuss the question of licensing activities within the ambit of the First Amendment . . . ." Nevertheless, presumably because the *Daniel* case did involve the licensing of "live entertainment" possibly protected by the First Amendment (see *In re Giannini,* 69 Cal.2d 563, 568-570 [72 Cal.Rptr. 655, 446 P.2d 535]), we disapproved *Daniel,* but only "insofar as its language may be deemed inconsistent with the results . . . announced" in *Burton.* (68 Cal.2d at p. 693.)

■ Therefore, we conclude that insofar as *Daniel* involved activities not falling within the ambit of the First Amendment, that case correctly held that the language of section 103.29 furnishes adequate standards to guide the Board in licensing matters and is not unconstitutionally vague. (See also *Saunders* v. *City of Los Angeles, supra,* 273 Cal.App.2d 407, 411-412; *Carolina Lanes, Inc.* v. *City of Los Angeles,* 253 Cal.App.2d 831, 835-836 [61 Cal.Rptr. 630]; *Sultan Turkish Bath* v. *Board of Police Comrs.,* 169 Cal.App.2d 188, 199-201 [337 P.2d 203].) It should be kept in mind that there are an infinite variety of activities or conduct which could result in potential or actual danger to the "peace, health, safety, convenience, good morals, and general welfare" of the public. A municipality cannot reasonably be expected to isolate and specify those precise activities or conduct which are intended to be proscribed. ■ As stated in *Daniel,* quoting from an earlier case, " ' "to make a statute sufficiently certain to comply with constitutional requirements [of due process of law] it is not necessary that it furnish detailed plans and specifications of the acts or conduct prohibited." ' " (190 Cal.App.2d 566, 574; see *Louis Stores, Inc.* v. *Department of Alcoholic Beverage Control,* 57 Cal.2d 749, 760 [22 Cal.Rptr. 14, 371 P.2d 758].[6]) ■ The fact that an ordinance seems to vest unlimited discretion in the licensing agency does not necessarily invalidate the ordinance, for "the same might be said of almost any licensing board established under the laws of this state; discretion is not uncontrolled and unguided if it calls for the exercise of judgment of a high order. [Citations.]" (*Eye Dog Foundation* v. *State Board of Guide Dogs for the Blind,* 67 Cal.2d 536, 548 [63 Cal.Rptr. 21, 432 P.2d 717]; see

---

[6]"It is settled, however, that the Legislature need not lay down minutely defined standards and that sufficient standards for administrative action may be found by implication from the general purposes of a statute and from the reasons which must have led to its adoption. [Citations.]" (P. 760.)

*O'Hagen* v. *Board of Zoning Adjustment,* 19 Cal.App.3d 151, 160-161 [96 Cal.Rptr. 484] ["good cause" standard contemplates that agency will make "a factual exposition of a reasonable ground for the sought order"]; *Iscoff* v. *Police Commission,* 222 Cal.App.2d 395, 405 [35 Cal.Rptr. 189].) Thus, in the absence of an ascertainable effect upon First Amendment activities, section 103.29 provides an adequate standard to guide the Board's discretion, namely, that it must exercise its permit powers in a reasonable, rather than arbitrary, manner to promote the interest of the public.

It is significant that petitioners do not contest the foregoing conclusion. Instead, they contend that the operations of a roller skating rink are entitled to First Amendment protection. They claim that such activities include the "entertainment" or "amusement" of their patrons, whose rights of free speech and assembly assertedly would be affected by the licensing ordinance. ■ However, no case has ever held or suggested that simple physical activity falls within the ambit of the First Amendment, at least in the absence of some element of communicating or advancing ideas or beliefs. Petitioners rely upon *In re Giannini, supra,* 69 Cal.2d 563, 567-572, wherein a majority of this court held that the performance of a nonobscene dance for an audience constitutes a method of expression protected by the First Amendment. It is apparent, however, that *Giannini's* rationale would be inapplicable to the activities conducted by petitioners herein. *Giannini* sought to express the principle that *"all* forms of communication, not merely the expression of concrete and definite ideas, *potentially* receive First Amendment protection." (P. 569, italics in original.) The key element is, of course, *communication.* We have difficulty finding that essential element to exist in the context of a roller skating rink. True, it is inevitable that some patrons of the rink watch the other skaters and are, perhaps, entertained or amused by their activities. And yet it seems inescapable that petitioners' patrons primarily use the facilities for physical exercise and personal pleasure; *Giannini's* element of communication between an artist or performer and his audience seems entirely lacking.

Petitioners also claim that "the joint participation involved in skating (and watching skaters) at a roller skating rink is an assemblage entitled to protection under the First Amendment guarantee of freedom of association and assembly . . . ." There is no question that petitioners' patrons are assembled together in one building or rink, and in that sense constitute an "assemblage." ■ But again, no case has ever suggested that the constitutional freedom of assembly or association extends to a congregation of persons engaged in mere physical activity or self-amusement. ■ "It is beyond debate that freedom to engage in association *for the advancement of beliefs and ideas* is an inescapable aspect of the 'liberty' assured by

the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech. [Citations.]" (Italics added; *N.A.A.C.P.* v. *Alabama,* 357 U.S. 449, 460 [2 L.Ed.2d 1488, 1498, 78 S.Ct. 1163].) In the words of our state Constitution, "The people shall have the right to freely assemble together *to consult* for the common good, *to instruct* their representatives, and *to petition* the Legislature for redress of grievances." (Italics added; art. I, § 10.)

■ Since any First Amendment activities involved in the operation of the Hollywod Rollerbowl would be negligible and wholly incidental to its evident function of providing an outlet for the amusement and exercise of its patrons, the *Burton* test for determining the validity of licensing statutes is inapplicable, and section 103.29 must be upheld as a reasonable exercise of a municipality's police power to license and regulate ordinary business activities.

## 2. *Evidentiary Support for Board's Findings*

As noted above, the Board entered separate, adverse findings regarding the operation of the Rollerbowl and denied petitioners' renewal applications "based on each of these adverse findings, *separately considered,* and on the further and separate grounds that the granting of this permit will not comport with the public health, safety, welfare, and good morals of the community." (Italics added.) The individual findings set forth separate grounds for denying the applications, including petitioners' 1967 conviction for violating a criminal ordinance for failure to provide adequate parking, petitioners' present failure (apart from the violation of ordinance) to provide parking, their failure to control their patrons and prevent disturbances in and near the premises, and their making a false statement on the 1968 application regarding ownership of the Rollerbowl.

Respondent Board has not challenged the trial court's determination that there was insufficient evidence to support the finding regarding the alleged false statement. Moreover, a serious question arises whether petitioners' inadequate parking conviction in 1967, being based upon a nolo contendere plea, properly could constitute grounds for administrative discipline. (See Pen. Code, § 1016, subd. 3; *Grannis* v. *Board of Medical Examiners,* 19 Cal.App.3d 551, 557-560 [96 Cal.Rptr. 863], and cases cited.) However, from our examination of the voluminous record herein, and its emphasis upon events occurring in 1968 and 1969, it is beyond question that the Board's decision rested primarily and alternatively upon petitioners' *continuing* failure to provide adequate parking facilities for Rollerbowl patrons and to control those patrons and prevent major disturbances in the area. It is inconceivable to us that the Board would have

granted petitioners' renewal applications but for the 1967 conviction and the alleged false statement (regarding ownership of the Rollerbowl).

██ Accordingly, since the Board's decision rested upon the foregoing alternative grounds, that decision should be sustained if its findings on those grounds were supported by the evidence, without remanding the cause to the Board for reconsideration. (See *Sica* v. *Board of Police Commissioners,* 200 Cal.App.2d 137 [19 Cal.Rptr. 277].)

██ ██ Before turning to the evidence, we briefly review the applicable rules governing review of the decisions of a local administrative agency such as the Board. "In conducting the hearing, the board acts as a local administrative tribunal, and it has power to make final adjudications of fact in connection with matters properly submitted to it." (*English* v. *City of Long Beach,* 35 Cal.2d 155, 158 [217 P.2d 22, 18 A.L.R.2d 547].) Upon review by the trial court, its inquiry is confined to determining whether there was substantial evidence before the board to support its findings; the court may not reweigh the evidence. (*Thompson* v. *City of Long Beach,* 41 Cal.2d 235, 240 [259 P.2d 649]; *Walker* v. *City of San Gabriel,* 20 Cal.2d 879, 881 [129 P.2d 349, 142 A.L.R. 1383]; *Upton* v. *Gray,* 269 Cal.App.2d 352, 359 [74 Cal.Rptr. 783].)[7] Similarly, appellate review of agency proceedings is limited to a determination whether substantial evidence exists to support the Board's findings. (*Sultan Turkish Bath* v. *Board of Police Comrs., supra,* 169 Cal.App.2d 188, 193; see Cal. Administrative Mandamus (Cont. Ed. Bar 1966), § 15.26, p. 281; Code Civ. Proc., § 1094.5, subds. (b) and (c).)

a. *Failure to provide adequate parking*—There was ample evidence introduced to establish that petitioners furnished inadequate parking facilities for their patrons, and that as a result their operations failed to comport with the "peace, health, safety, convenience . . . and general welfare of the public."[8] Officer Trojanowski testified that he had visited the Rollerbowl approximately twenty times and had observed no off-street parking facilities; six of his visits were made while processing petitioners' 1968 renewal application. Sergeant Kilgo testified that, beginning in May

[7]As neither party has raised the issue, we need not now consider the continued viability of the foregoing authorities. (See *Bixby* v. *Pierno,* 4 Cal.3d 130, 137, fn. 2 [93 Cal.Rptr. 234, 481 P.2d 242].)

[8]Some, but by no means all, of the evidence was admitted in the form of hearsay testimony. Section 102.10, subdivision (e), of the ordinance permits the introduction of hearsay evidence for the purpose of supplementing or explaining direct evidence, "but shall not be sufficient in itself to support a finding unless it would be admissible over objection in civil actions." (See also Gov. Code, § 11513; *Nardoni* v. *McConnell,* 48 Cal.2d 500, 504-505 [310 P.2d 644]; *Sultan Turkish Bath* v. *Board of Police Comrs., supra,* 169 Cal.App.2d 188, 198-199.) Our review of the evidence indicates that none of the Board's findings was based solely or even substantially upon such hearsay evidence.

1968, he toured the Rollerbowl area at least once a night, and that "in my perusal of the area I have seen no parking lot or designated parking lot for the skating rink in the area." Mr. Woodward, chief investigator with the department of building and safety, testified that he inspected the premises in January 1969, observed no parking facilities for Rollerbowl patrons, and was informed by its manager that Rollerbowl had no public parking whatever, having lost the use of certain lots previously leased from private owners.

Petitioners' own evidence confirmed their inability to provide adequate parking facilities. Rollerbowl's president, Mr. Decker, testified that as of January 23, 1969, Rollerbowl maintained only one parking area, in an alleyway to the immediate south side of the rink, with space for only 25 to 30 cars. Because of the confined space (the area is 19½ feet wide) and the possibility of blocking private access, it was necessary to employ a valet to accommodate any more than 20 cars. Valet parking was not initiated until after January 1969. Decker testified that Rollerbowl had, "for a period of time," other parking facilities but he admitted that the valet parking area was the only parking lot accessible as of January 1969.

According to Decker, the Rollerbowl had the use of one lot, accommodating 40 to 60 cars, at the northwest corner of Sunset Boulevard and St. Andrews Avenue, but that this facility terminated in May 1968. A larger lot at the rear of 1515 Northwestern Avenue, holding 72 to 120 cars was available from April 1967 to April 1968, but terminated when Rollerbowl's lease thereto expired. At the January 1969 hearings, Decker testified that Rollerbowl was negotiating for additional parking space and had appealed an adverse zoning decision affecting the proposed lot. At the subsequent hearings in June 1969, however, petitioners' counsel admitted that the Los Angeles Board of Zoning Adjustment had sustained the decision of its zoning administrator denying petitioners' application for a variance, and that petitioners still had no additional parking area.

Thus, the uncontradicted evidence shows that from May 1968 through June 1969 when the hearings concluded, petitioners had, at most, only one parking area and could accommodate only 20 to 30 automobiles. This evidence indicated that petitioners may have violated applicable Los Angeles ordinances requiring the maintenance of off-street parking.[9] We

---

[9]Section 12.21, subdivision A, paragraph 4, sub-paragraph (e), of the Los Angeles Municipal Code, applicable to an auditorium, stadium, or "other similar place of assembly," requires at least one parking space for each five fixed seats, or if there are no fixed seats, one space for each 35 square feet of floor area, exclusive of stage. The evidence showed that on March 1, 1967, petitioners were convicted of violating this section, following a nolo contendere plea. Petitioners do not claim that the availability of 30 parking spaces in their alleyway parking area would satisfy the require-

need not decide that question, however, for the central question before the Board throughout these lengthy hearings was not whether petitioners had violated an applicable parking ordinance but whether the parking facilities which petitioners did provide were too inadequate to comport with the "peace, health, safety, convenience . . . and general welfare of the public." Our review of the record discloses substantial evidence to support such a finding.

Sergeant Kilgo testified that he had received numerous complaints from neighborhood businesses to the effect that petitioners' patrons parked their cars on private property without the owners' consent and blocked traffic by double parking; Kilgo's own investigations confirmed these complaints. Witnesses Grimes and Dollarhide testified that they had observed substantial traffic congestion caused by Rollerbowl patrons making U-turns, double, triple, or other illegal parking, or exiting from parking spaces in a hazardous manner; Grimes himself had seen patrons park on private property on 40 to 50 different occasions. Lieutenant Gleb testified concerning traffic congestion occurring when the Rollerbowl closed for the evening, and "upward of 300 people" are released from the rink. As Gleb stated, "the lack of parking facilities is a tremendous problem here. . . . The Rollerbowl has no [adjoining parking] facility . . . . They have no parking and this disgorges all of the people via the front door, so we have this built-in potentially volatile situation just because of the sheer number of people who are leaving . . . ."

Officer Perry, testifying in January 1969, confirmed testimony regarding the substantial illegal parking in the Rollerbowl area; he personally issued 10 to 15 traffic citations every Sunday night. Perry noted that "On Sunday and Tuesday nights, the parking situation is a complete mess. . . . Numerous vehicles parked in the red zones, in front of fire hydrants, blocking driveways around the area, double parking, . . . parking on [a] private parking lot. . . . Sunset Boulevard, at that time, on Sundays and Tuesdays is completely congested and the movement of traffic at numerous times [is] brought to a complete standstill." Officer Seybert likewise testified concerning numerous parking violations, congestion and traffic diversion attributable to the Rollerbowl and its patrons. He esti-

---

ments of subparagraph (e) of the ordinance. (The evidence indicates that the *exterior* area of the Rollerbowl is 35,000 feet.) Instead they assert that a roller skating rink is not a "place of assembly" under that subparagraph, and that consequently the Rollerbowl falls within the general category "commercial and industrial building," with less stringent parking requirements (see § 12.21, subd. A, par. 4, subpar. (c)). Under our analysis of the problem, we need not pass upon this contention, for under the evidence in this case the Board had the authority to refuse to renew petitioners' permit whether or not they violated a municipal parking ordinance.

mated that there were from 250 to 300 cars in the area of the rink on Sunday nights. Other witnesses, including Rollerbowl personnel, estimated that on "popular" nights such as Tuesday and Sunday, the Rollerbowl would attract a crowd of from 700 to 800 people.

In summary, it seems fair to conclude that substantial evidence was introduced to support the determination that Rollerbowl furnished insufficient off-street parking for its patrons, and that the public safety, convenience and welfare was thereby threatened or impaired.

Petitioners point out that the foregoing evidence related to conditions from 1968 through January 1969, and refer us to certain testimony by Rollerbowl officers and employees in June 1969 that the parking problems were diminishing by that time.[10] Petitioners therefore assert that no evidence was introduced to show that inadequate parking existed at the time the Board made its findings in September and October 1969.

As noted above (fn. 2, *ante*), the hearing examiner acknowledged some improvement in conditions in the area but nevertheless concluded that Rollerbowl's operations failed to comport with the general welfare of the public. That conclusion seems reasonable. First of all, the evidence showed that as of June 1969 when the hearings concluded, Rollerbowl maintained only one parking area for 30 cars at most to accommodate its hundreds of patrons. The Board and its examiner could reasonably conclude that under such circumstances the incidence of illegal parking and congestion were likely to continue, especially with the approach of summer vacation. Second, at hearings before the Board itself in September 1969, witness Klein, a property owner across the street from the Rollerbowl, testified that "we still are not able to use our parking lot at nighttime. It hasn't changed. . . . We have our own private parking lot, and we still are not able to use it, and we still have trouble with these youngsters."

Finally, the scope of the prolonged hearings was confined to the question whether petitioners were entitled to renewed permits for the years 1968

---

[10]For example, at the June 1969 hearings, Rollerbowl personnel testified that several months prior to June a sign was posted directing patrons to the alleyway parking area, and that since that time that parking area has never been completely filled with cars. Petitioners assert that such evidence established that it was providing ample parking facilities. The Board was not required, however, to accept petitioners' premise that the asserted availability of a few parking spaces in an adjacent alleyway indicated that petitioners had solved their parking difficulties. As the trial court stated following its review of the record, "It is my belief that this parking area on the south side of the applicant's place of business is really not a parking area; it is a private alleyway. It could not accommodate sufficient cars to be worthwhile. It is a talking point and a very poor talking point that you have a parking space and it is never full. I can well believe it is never full because it would only be a very foolish person that would go in there in the first place."

and 1969. Since substantial evidence was introduced that, at least through January 1969, petitioners' facilities were inadequate, thereby adversely affecting the public welfare, the Board had the authority to rule that petitioners were not entitled to operating permits for those years. If, as petitioners claim conditions in the area have substantially improved, we see nothing which would prevent them from filing a new application for permit. As stated in section 103.38 of the ordinance in question, "When an application for a permit is denied for cause, no new or other application for a permit from the same person shall be accepted within one year after denial, unless the applicant can show a material change in his situation which would justify the issuance of such permit."

Petitioners contend that they were never informed by the Board that one of the conditions imposed by the Board in originally granting an operating permit for Rollerbowl was that petitioners must provide adequate parking facilities for their patrons. The contention is without merit. First of all, petitioners were forewarned by sections 103.29, subdivision (c), 103.31, subdivision (b), and 103.35, subdivision (j), of the Municipal Code that a renewed permit could be denied if their operations failed to comport with the peace, health, safety, convenience and general welfare of the public, or constituted a public nuisance. Secondly, petitioners were, of course, charged with knowledge of the provisions of section 12.21 of the Municipal Code pertaining to off-street parking (see fn. 9, *ante*).

■ But aside from the notice charged to petitioners by reason of the foregoing ordinances, it is an accepted rule of law (and one with which petitioners may be deemed familiar) that a business permit may be revoked by a municipality if the permittee either fails to comply with the conditions expressed in its permit *or* if there exist a compelling public necessity justifying revocation, as where the conduct of that business constitutes a public nuisance. (*Jones* v. *City of Los Angeles,* 211 Cal. 304, 315 [295 P. 14]; *O'Hagen* v. *Board of Zoning Adjustment, supra,* 19 Cal.App.3d 151, 158-159.) ■ As this court stated in *Jones* (at p. 316), "once an undoubted *menace* to public health, safety, or morals is shown, the method of protection [available to a municipality] may be drastic. Private businesses may be wholly prohibited, where their danger is sufficiently great; and other businesses, no matter how well established and how great the resulting loss, may be excluded from certain districts where, by reason of the circumstances, their maintenance has become a public nuisance in those districts. In these cases, the public welfare demands even the destruction of existing property interests." (Italics added; accord, *O'Hagen* v. *Board of Zoning Adjustment, supra.*)

■ In the instant case, the Board expressly found that "due to

insufficient parking facilities for the permitted activity, the operation of the business constituted a *menace* to the detriment of the neighborhood and, as such, does not comport with the public health, safety and welfare." (Italics added.) Under the circumstances, petitioners cannot complain that they had no notice that they were expected to maintain adequate parking facilities for their patrons.

Petitioners also claim that they were not afforded notice by the Board that they were charged with failing to provide adequate parking. The original "notice of intention to deny permit" issued by the Board in October 1968 charged, among other things, that "applicant" had, on March 1, 1967, violated a municipal ordinance "in that applicant *had failed* to provide sufficient parking facilities for its premises" (italics added), that on July 22, 1968, applicant violated its probation relating to this prior violation "in that applicant *continuously refuses* to provide adequate parking for its premises" (italics added), that letters of protest from interested persons have been received which reflected that Rollerbowl's *proposed* operations would not comport with the "peace, health, safety, convenience, good morals and general welfare of the public," and that operation of the premises has required numerous man-hours and police patrols of the premises to prevent and control major disturbances. Taken as a whole, the notice seems adequate to advise petitioners that one ground upon which Board proposed to deny their renewal application was petitioners' failure to provide adequate parking for their patrons. True, the issue was phrased in terms of a prior conviction and violation of probation, yet petitioners must have known that the Rollerbowl's off-street parking facilities were at issue in the case.

Indeed, the record indicates that petitioners were not misled by the notice; counsel permitted the introduction of adverse testimony on the question without objection and actively litigated the matter throughout the hearings. (See *Kirby* v. *Alcoholic Bev. etc. App. Bd.*, 3 Cal.App.3d 209, 216-217 [83 Cal.Rptr. 89]; *Vaughn* v. *Board of Police Comrs.*, 59 Cal.App.2d 771, 777-778 [140 P.2d 130].) As these hearings extended from December 1968 to June 1969, petitioners had ample time in which to prepare their defense.

In a related argument, petitioners contend that the notice "does not raise the issue of whether appellants are *presently* providing sufficient parking facilities. The only reference . . . as to parking facilities relates to the . . . parking situation *as of March 1, 1967*." (Italics added.) As petitioners' counsel himself acknowledged during the Board hearings, however, "The issue presented by that Notice of Intention is whether the— at least on the face of it—is whether the operation will not comport with

the peace, health, safety, convenience, good morals, and general welfare of the public. *That issue is to be determined, I submit, at the time that the decision is made by the Commission, by the Board, and not as of the time that the Notice of Intention was submitted. . . .* [A]nd it seems to me that . . . evidence of what has transpired right up until the present time, at the very least, is admissible." (Italics added.) We conclude that evidence pertaining to petitioners' operations subsequent to March 1967 was within the scope of the Board hearings, and that such evidence furnished a proper basis upon which the hearing examiner and Board could refuse to renew petitioners' operating permit for the years 1968 and 1969.

b. *Failure to control patrons and prevent disturbances*—The Board found that petitioners had conducted the Rollerbowl in a manner contrary to the general welfare of the public, "in that said operation has resulted in batteries against police officers, assaults with deadly weapons, drunks, robberies, thefts from motor vehicles, disturbing the peace—which acts have caused numerous arrests for these offenses." The Board also found that, by reason of the foregoing problem, the city police were required "to spend numerous man-hours and efforts on the part of patrol, in the setting up of command posts, assignment of men to special details and special patrols of the premises to prevent and to control major disturbances."

The foregoing findings were supported by substantial evidence. Various officers testified regarding a substantial incidence of crime in the immediate vicinity of the Rollerbowl and attributable to its patrons. Thus, Sergeant Kilgo testified that he was called to the area on six specified dates in August 1968 and once in October 1968. For example, on August 4, at 10:20 p.m., he responded to a citizen's complaint and observed a crowd of 300 to 500 people at the rink's entrance, throwing rocks and bottles, breaking windows with their roller skates, and assaulting and harassing police officers. On this night, 28 persons were arrested for felonies, including motor vehicle burglary, assault with deadly weapons, robbery and drug offenses. On August 25, at 10:30 p.m., Kilgo observed 400 to 600 persons milling around in front of the rink; by 11:15, there were approximately 200 persons on each side of the street. Traffic was blocked and a fight started at the rink's entrance; two assault victims had to be removed by ambulance. Kilgo further testified that three strong-armed robberies had been committed by juveniles in the immediate vicinity of the rink, that at least one assault with a deadly weapon had occurred inside the premises, and that Kilgo had personally observed numerous persons exiting the rink in a drunken or drugged state, fighting and arguing. Witness Rocklus, owner of a nearby motel, testified that incidents

of fighting and other loud disturbances in the area of the Rollerbowl and involving 100 to 200 persons occurred "52 Sundays out of a year."

Lieutenant Gleb testified that there had been a large increase in complaint calls from private citizens, and an increase in crime in the Rollerbowl area; in a six-month period in 1968, the Hollywood Division alone expended 3,200 man-hours in special assignments in the area.[11] Gleb further testified that 20 additional policemen would be required to control the Rollerbowl crowds on Tuesday and Sunday nights.

Other evidence was introduced to show that, at least until January 1969, Rollerbowl released its hundreds of patrons at closing time through a single exit in front of the rink, and that these patrons frequently loitered at the entrance, fighting with themselves, attacking police officers and guards who were attempting to disperse crowds, assaulting drivers of cars, and interfering with the operations of an adjoining motel. Sergeant Van Vleck testified that the manager of the Rollerbowl had admitted to him that patrons smoked marijuana inside the rink, particularly in the men's room, that some juveniles at the rink were under the influence of drugs and alcohol, and that this matter had become quite a problem.

Other testimony disclosed that fighting between patrons occurred within the rink itself. For example, on one occasion a fight broke out on the skating surface of the rink, and when security guards attempted to break up the fight, a patron grabbed the guard's gun and the guard was forced to strike the patron with his flashlight in order to retrieve his weapon. On another occasion, a guard had to fire a few rounds of ammunition into the air in order to dispel a fight. Witness Rocklus testified that Rollerbowl guards had informed him that Rollerbowl's policy for handling trouble-makers was simply to "grab them and throw them outside," rather than arrest or detain unruly patrons until they quieted down or sobered up. Sergeant Van Vleck testified that Rollerbowl's manager informed him that if security guards "caught anybody with a bottle or can of beer or anything, they were to be ejected." Rollerbowl's own personnel testified that in the event of fighting inside the rink, the participants would be

---

[11]Gleb testified that "The increase in the called-for services in the vicinity of the Rollerbowl, the crowd control problem, per se, that can only be handled by additional officers, and when I say the crowd control problem, per se, I am referring to illegal parking, double parking and the number of people that appear on the street in front of and around the Rollerbowl that require additional policing because of that [*sic*] acts that they are involved in, such as window breaking; we have had a high incidence of purse snatches, assaults on pedestrians, vehicular mischief complaints and crimes in that particular area and the only way I can handle these called-for services and the problem dealing with the people themselves on the street, the crowd control, in other words is to field additional men."

released separately; in the event an adult patron became drunk, he was released in the custody of another adult; if a child were involved, his parents were informed to come pick him up.

Petitioners contend that the foregoing evidence largely concerned matters occurring outside of the Rollerbowl or beyond petitioners' reasonable control. They rely upon cases which suggest that ordinarily a lawful business enterprise may not be abated as a public nuisance merely because some of its patrons act improperly. (See *Tarbox* v. *Board of Supervisors,* 163 Cal.App.2d 373, 377-378 [329 P.2d 553] [homosexual patrons committing lewd acts in movie theater].) ▮ Although as a general rule a licensing agency may not impose upon its licensees the responsibility of governing conditions beyond their control (see *Flores* v. *Los Angeles Turf Club,* 55 Cal.2d 736, 743 [13 Cal.Rptr. 201, 361 P.2d 921]; *Sultan Turkish Bath* v. *Board of Police Comrs., supra,* 169 Cal.App.2d 188, 197-198), a business catering to the general public may, under certain circumstances, be accountable for the disruptive conduct of its patrons, whether on or off the premises. "Crowds of disorderly people who disturb the peace and obstruct the traffic may well impair the free enjoyment of life and property and give rise to the hazards designated in the [public nuisance] statute." (*People* v. *Lim,* 18 Cal.2d 872, 882 [118 P.2d 472] [operation of gambling house]; see *O'Hagen* v. *Board of Zoning Adjustment, supra,* 19 Cal.App.3d 151, 163, fn. 6 [drive-in restaurant]; *People* v. *Robin,* 56 Cal.App.2d 885, 890 [133 P.2d 436] [cafe]; *People* v. *Montoya,* 137 Cal.App.Supp. 784 [28 P.2d 101] [beer hall]; *Wade* v. *Fuller* (1961) 12 Utah 2d 299 [365 P.2d 802, 804-805] [drive-in restaurant]; Civ. Code, § 3480 [defining public nuisance as one which "affects at the same time an entire community or neighborhood, or any considerable number of persons"].)

But we need not reach the question to what extent a licensee remains accountable for off-premises disturbances beyond his reasonable control, for it seems apparent from the evidence that a substantial portion of the disturbances occurring in the neighborhood of the Rollerbowl were attributable to petitioners' methods of operation and may be said to lie within their reasonable control. The Board could reasonably infer that petitioners' failure to provide adequate parking facilities for their patrons led to the serious traffic congestion, numerous and varied traffic offenses, and thefts and misuse of private property documented in the record. Petitioners' failure to arrange for the orderly dispersal of its hundreds of patrons at closing hour could foreseeably encourage street fighting and mob rioting, as well as enhance traffic congestion. The Board could also conclude that some of the disturbances occurring outside the rink were attributable to petitioners' failure to control or restrain those patrons who,

when ejected from the rink for disorderly conduct, were likely to cause further mischief outside the premises. ▮▮▮ We conclude that the Board's findings regarding petitioners' failure to control its patrons and prevent public disturbances were supported by substantial evidence and constituted sufficient ground to refuse to renew petitioners' operating permit.[12] We emphasize again, however, that our decision (and the Board's findings) pertain only to the question whether petitioners' permit should be renewed for the years 1968 and 1969. Pending our decision, petitioners have continued to operate the Rollerbowl and presumably have the opportunity, under section 103.38 of the ordinance, discussed above, to make a new application for a permit. Thus petitioners may be able to convince the Board that, with the passage of time, the conditions which once justified a denial of their renewal application no longer exist.

### 3. *Miscellaneous Issues*

Petitioners raise several miscellaneous issues pertaining to the procedure employed by the Board in denying their renewal applications. First, petitioners contend that the ordinance gave to the Board no authority to deny such applications. Under section 103.06, subdivision (a), of the ordinance, their existing permit was "good until revoked, suspended or cancelled," and the Board did not purport to revoke, suspend or cancel that permit. The record indicates, however, that it has been the Board's practice to issue a permit on an annual basis and to require permittees to file renewal applications along with the annual police permit fee provided for under section 103.07 of the ordinance. That practice has been held to be consistent with the terms of the ordinance, in that the provisions which authorize the Board to "deny" a permit "were intended to set up the procedure and grounds for denying an original permit and for denying a renewal of a permit," whereas those sections pertaining to suspension or revocation were intended to apply only to a permit "previously issued and in force, prior to its normal expiration." (*Saunders* v. *City of Los Angeles, supra,* 273 Cal.App.2d 407, 410.)[13]

---

[12]It has been suggested that the effect of our holding will be to require licensees to hire "external roving security guards" to supervise and police off-premises areas. Yet nothing in our opinion should be taken as requiring or even sanctioning the use of private guards whose activities might interfere with the operations of public law enforcement agencies. A licensee must, however, at least take reasonable measures to control its patrons' conduct and prevent major disturbances. In the instant case, there was substantial evidence indicating that the police problems which did occur were aggravated by petitioners' failure to provide adequate parking, to arrange for the orderly dispersal of patrons at closing time, and to restrain unruly, drunken or drugged patrons exiting the premises.

[13]In a related argument, petitioners contend that the trial court erred in barring the introduction of evidence showing that the Board had adopted a "practice" of

 Moreover, as noted in *Saunders,* even if the Board had mis-characterized the nature of the proceedings, petitioners "[have] suffered no prejudice, since the grounds for adverse action are the same under either group of sections." (P. 410.) Thus, under section 103.34 of the ordinance, the Board may revoke a permit for violation of any act constituting grounds for discipline. One such ground for discipline under the ordinance (§ 103.35, subd. (j)) is that the permittee "conducted the permitted business in a manner contrary to the peace, health, safety, and general welfare of the public," substantially the same ground upon which the Board denied petitioners' renewal applications.

 Petitioners next contend that since the Board failed to issue to them a notice of intention to deny their *1969* renewal application, the Board should be precluded from denying it. As set forth above, however, the 1969 renewal application was filed during the pendency of the Board hearings on the 1968 application, at a time when petitioners had already been notified of the Board's intention not to renew their permit. Accordingly, they could not possibly have been prejudiced by the Board's failure to give further notice of its intentions. Moreover, since petitioners were not operating under a 1968 permit when they submitted the 1969 renewal application,[14] they had no existing permit to "renew" and the latter application could have been denied on that ground alone.

 Petitioners contend further that the Board lost jurisdiction to deny their 1968 application at the expiration of the 1968 calendar year, and that the matter thereupon became moot. It seems clear, however, that the Board had continuing jurisdiction to rule upon the question whether petitioners' permit, which presumably expired on December 31, 1967, should be renewed. Section 103.39 of the ordinance contemplates the continuation of permit hearings after "cancellation or suspension of a permit by operation of law," indicating an intent to preserve the Board's jurisdiction in cases wherein a permit has expired through the passage of time. Moreover, the question whether petitioners were entitled to a permit for 1968 had an independent significance, for if the 1968 application were ultimately denied, petitioners would be precluded, under section

---

automatically granting all renewal applications; petitioners sought mandate to compel the Board to perform this "ministerial act." The contention is without merit. As indicated in *Saunders* v. *City of Los Angeles, supra,* 273 Cal.App.2d 407, the Board has, as early as 1966 at least, denied such renewal applications. Moreover, we question whether the existence of such a "practice" would bar or estop the Board from exercising its authority to deny renewal applications where the public interest so requires. (See *Iscoff* v. *Police Commission, supra,* 222 Cal.App.2d 395, 405-406.)

[14]Under section 103.40, subdivision (a), a permittee may remain in business pending the Board's final determination of a proceeding to revoke or suspend a permit.

103.38, from reapplying for a permit until one year had passed, in the absence of a satisfactory showing that conditions had changed in the meantime. We conclude that the question was not rendered moot by the passage of time. (See *Johnstone* v. *Richardson,* 103 Cal.App.2d 41, 48 [229 P.2d 9].)

Petitioners next contend that rather than deny their operating permit outright, the Board should have granted a *conditional* permit, subject to whatever reasonable conditions the Board deemed appropriate, such as the acquisition of additional parking facilities and the institution of more effective methods of controlling and dispersing patrons. It is clear, however, that the issuance of such a conditional permit was a matter lying wholly within the Board's sound discretion (see Los Angeles Mun. Code, § 103.29, subd. (b)), and under the circumstances of this case, we find no basis for holding that the Board abused that discretion in denying petitioners' renewal applications. The Board was entitled to assume, for example, that until the Rollerbowl acquired additional parking facilities the problems previously discussed would continue unabated, and that it would not be within the public interest to grant, even conditionally, a permit authorizing continued operations in the area. Moreover, it appears that petitioners have not been prejudiced by the failure of the Board to grant a conditional permit, since the Rollerbowl has continued in operation since the date of the Board's decision. If conditions have now changed, and the Rollerbowl's operations no longer present a substantial police problem, the Board may favorably entertain a new application for permit to operate the Rollerbowl.

Petitioners' remaining contentions, namely, that the Board improperly considered certain "remote" evidence, and that the Board should have granted an entirely new hearing upon discovering that some transcriber's notes had been lost (rather than reopening hearings in June 1969 to receive testimony from the witnesses involved), are patently without merit. The Board acted well within its discretion in both of these matters.

The judgment is affirmed.

Wright, C. J., McComb, J., and Tobriner, J., concurred.

**MOSK, J.,** Concurring and Dissenting.—I agree with that portion of the majority opinion holding that petitioners' failure to provide adequate parking facilities justified the Board's decision not to renew the permit.

However, while thus correctly affirming the Board's decision, the opinion unfortunately encourages, indeed almost compels, an owner of a business for which an operating permit is necessary to hire its own private police

force. It appears to be contemplated that this gendarmerie would keep patrons under surveillance after they leave the business premises and until they are no longer within "the immediate vicinity" of the establishment. Because the existence and activities of numerous private security forces in communities may actually exacerbate the disruptive activity which has alarmed the Board, I cannot agree with that portion of the opinion which places significant responsibility on licensees to control the conduct of departing patrons after they have reached public streets and sidewalks.[1] I insist that the peace and security of organized society depends upon such responsibility remaining with appropriate law enforcement agencies.

That portion of the majority opinion which implies the need for private policing can be expected to have a mushrooming impact: licensing agencies will feel free to deny permit renewals on the ground that the licensee has not adequately supervised public property in the area outside of its establishment. In turn, licensees, in order to remain in business, will find it necessary to hire external roving security guards. When viewed in the factual context of this case, such guards will undoubtedly play a significant role in the handling of tumultuous disturbances involving vast numbers of people, perhaps even facilitating, or hampering, massive arrests. This will be undertaken even though private police seldom possess the skills or receive the specialized training available to regular local law enforcement personnel. The potential effect which private police operations, performing a public function on public property, might have on the constitutional safeguards protecting individuals from unreasonable searches and seizures, coerced confessions and on those rights enunciated in *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], and related high court cases, is unsettling.

The requirement that licensees control disturbances on public streets and sidewalks is not compelled by the cases cited by the majority. The language contained in *People* v. *Lim* (1941) 18 Cal.2d 872, 882 [118 P.2d 472], a case primarily concerned with the availability of civil injunctions to prevent the violation of criminal laws, does not require the conclusion that licensees must police adjacent streets. In essence, *Lim* says that crowds of disorderly people may (1) create traffic problems and (2) disturb the peace. The former charge is adequately covered by the

---

[1]While the majority purport to avoid deciding "to what extent a licensee remains accountable for off-premises disturbances beyond his reasonable control" (*ante,* p. 84) the issue cannot be brushed under the rug since it was one of the two bases for the Board's denial of the petitioners' application. And the majority opinion approves "the Board's findings regarding petitioners' failure to control its patrons and prevent *public* disturbances" (*ante,* p. 85; italics added) and the refusal to renew the permit on that ground.

majority's opinion on petitioners' parking facilities. The second element, at least as discussed in *Lim,* is ambiguous since it could refer to conduct occurring on or off the premises.

The majority also rely on a footnote in a Court of Appeal case, *O'Hagen* v. *Board of Zoning Adjustment* (1971) 19 Cal.App.3d 151, 163, footnote 6 [96 Cal.Rptr. 484], but this citation does not provide persuasive support. The court appeared primarily concerned with the "noise, odors and creation of traffic and attendant circumstances" (19 Cal.App.3d at pp. 164-165), citing *Willson* v. *Edwards* (1927) 82 Cal.App. 564 [256 P. 239], even though the complaint did allege other activity occurring off the premises as contributing to the nuisance. In *Willson,* an injunction was upheld upon the court's understanding that if "no disturbing noise is created *in the conduct of defendants' business* during the hours mentioned, nothing is restrained." (*Id.,* p. 571; italics added.)

*People* v. *Robin* (1943) 56 Cal.App.2d 885 [133 P.2d 436], and *People* v. *Montoya* (1933) 137 Cal.App.Supp. 784 [28 P.2d 101], involved establishments primarily engaged in serving alcoholic beverages. Even assuming an owner of a tavern has some duty to prevent its patrons from becoming an unconscious burden on the adjacent sidewalk, petitioners here were not operating a beer hall but a roller skating rink. Evidence proffered by petitioners indicated that the rink's management did not countenance the consumption of alcohol on the premises. As the majority concede, "Sergeant Van Vleck testified that Rollerbowl's manager informed him that if security guards 'caught anybody with a bottle or can of beer or anything, they were to be ejected.' " (*Ante,* p. 83.)

The reliance on saloon (*Robin* and *Montoya*) and gambling (*Lim*) cases, none of which involved a municipal body refusing to grant a permit for failure to patrol public property, and a drive-in restaurant (*O'Hagen*) case, is inapposite for a fundamental reason. The owners of such places of business, which charge no admission fee, derive their economic benefit from people, attracted to the outside of the establishment, coming in to drink or eat, or to be entertained, then leaving or loitering and returning frequently to the premises for more drinks, food or companionship. In the case of a saloon, that some individuals will lose consciousness on the adjacent sidewalk can be directly related to a tavern owner's desire to sell more drinks and by the failure of such owner to refuse to serve alcohol to an intoxicated patron.

In the case at bar, the activities on public streets and sidewalks are not so causally related. (Cf. *Commonwealth* v. *Tick, Inc.* (1967) 427 Pa. 120 [233 A.2d 866, 868].) In fact such violent conduct on the part of patrons

and passers-by may adversely affect petitioners' business by deterring potential customers from patronizing the rink and by causing property damage to petitioners' buildings and fixtures. (Cf. *Commonwealth* v. *Tick, Inc., supra,* at p. 869 [of 233 A.2d], dissenting opinion by Eagen, J.) Absent a direct causal relationship between the nature of the activities taking place inside the roller rink and those occurring outside, and absent a showing that petitioners encouraged or acquiesced in the disorderly conduct off the premises, licensee responsibility should not attach.

The general rule as enunciated by this court in *Flores* v. *Los Angeles Turf Club* (1961) 55 Cal.2d 736 [13 Cal.Rptr. 201, 361 P.2d 921] and by the appellate court in *Tarbox* v. *Board of Supervisors* (1958) 163 Cal.App.2d 373 [329 P.2d 553], remains sound: a licensee is responsible for governing only patrons' activities which are reasonably within the scope of the licensee's control. In *Flores* we said that the state had a legitimate interest in holding the licensees responsible for those "[P]ersons presently conducting themselves improperly *on the premises*" but that "the state may not impose on them the responsibility of governing conditions beyond their control." (55 Cal.2d at p. 743.) *Flores* and *Tarbox* both dealt with conduct of patrons prior to their coming onto the premises. There is no rational reason for a different rule applied to conduct subsequent to leaving the establishment unless the licensee gains direct benefit from, or acquiesces in, the disorderly conduct occurring on public property. (Cf. *People* v. *Robin* (1943) *supra,* 56 Cal.App.2d 885, 888.)

The distinction between allowing a licensee to hire internal security guards and requiring a licensee to employ a mini police force to restrain troublemakers on neighborhood streets is clear. On-the-premises security guards provide protection for patrons, employees and the physical plant from the mischievous conduct of fellow patrons or unwanted intruders. The guards' role is essentially reactive, and is primarily limited to the physical confines of the building. Much of their work can be eased by a proper screening process at the box office, i.e., refusing admission to those who, for example, are intoxicated or have misbehaved while in the building on previous occasions. The presence of posted security guards serves to deter further rowdiness. The role of such personnel changes drastically when, as the majority would have them do, they are to comb the surrounding area, break up outside groups, protect adjacent property, direct traffic, and attempt to quell riotous conditions. Such functions directly invade the province reserved for appropriate law enforcement agencies.

The wisdom of the rule that the responsibility for disorderly conduct occurring on public streets and sidewalks rests in government and not in private hands has not been questioned since early civil nuisance

actions. In *Pfingst* v. *Senn* (Ky. 1893) 23 S.W. 358, the court refused to enjoin the opening of defendant's "resort and beer garden." The complaint alleged that previously a similar establishment was operated on the same property and that "crowds of idle and disorderly spectators were drawn by the music, and their habitual presence in the streets became to the neighbors a source of annoyance and a nuisance." (23 S.W. at p. 359.) To this contention the court responded: "[T]he idle and disorderly crowd of 'hangers on' may easily and summarily be disposed of on complaint to the municipal authorities." (23 S.W. at p. 360.)

The Supreme Court of Iowa reached a similar conclusion in *Mitchell* v. *Flynn Dairy Co.* (1915) 172 Iowa 582 [151 N.W. 434], modified on other grounds, 154 N.W. 878. There the court held that noise emanating from an alley used almost exclusively by defendant constituted a nuisance but stated the following with regard to noise caused by farmers unloading milk on a public avenue for delivery to defendant's dairy company: "Some complaint is made by plaintiffs as to the condition of the avenue created by the conduct of farmers who unhitched and fed their teams upon the avenue in front of the plaintiffs' residences. These farmers were patrons of the defendant company in that they sold and delivered milk to it daily. We think the defendant was not chargeable with the conduct of these persons. They alone were chargeable with such misconduct. Such use of the street could be easily prevented by appropriate warning and prosecution . . . ." (151 N.W. at p. 438.)

The majority opinion in the instant case, by requiring petitioners to police the public streets and sidewalks surrounding their establishment, takes an ominous step toward resurrecting the long rejected doctrine of self-help, even though it is a wisely established principle that the "first business of the law, and more especially of the law of crime and tort, is to suppress self-help." (3 Holdsworth, A History of English Law (5th ed. 1942, reprinted 1966) at p. 278; also see *Daluiso* v. *Boone* (1969) 71 Cal.2d 484, 495 [78 Cal.Rptr. 707, 455 P.2d 811].)

It is my opinion that the law does not require petitioners to police the streets and sidewalks in the neighborhood of their establishment, and that the Board could not deny the permit on such ground absent a showing of encouragement of or acquiescence in disorderly conduct.

Peters, J., and Sullivan, J., concurred.

Appellants' petition for a rehearing was denied June 29, 1972. Peters, J., and Sullivan, J., were of the opinion that the petition should be granted.