[No. A051182. First Dist., Div. Two. Feb. 3, 1992.]

GARRICK DEVELOPMENT COMPANY et al., Plaintiffs and Appellants,
v.
HAYWARD UNIFIED SCHOOL DISTRICT et al., Defendants and Respondents.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication except for the discussion under the heading "Equal educational opportunity" in part IV.

**COUNSEL**

Varni, Fraser, Hartwell, Lanferman & Rodgers and David P. Lanferman for Plaintiffs and Appellants.

Breon, O'Donnell, Miller, Brown & Dannis and Priscilla Brown for Defendants and Respondents.

**OPINION**

**SMITH, J.**—Plaintiff developers of residential property appeal from an order, in consolidated cases, denying them a petition for writ of mandate by which they sought the return of school facilities fees they had paid under protest (Gov. Code, former §§ 65913.5 and 66008 (now § 66020)) as conditions to obtaining building permits.[1] They urge that defendants Hayward Unified School District (HUSD or the district) and its governing board of education (the board) imposed the fees in violation of statutory requirements and constitutional limitations. We affirm.

---

[1] All section references in this opinion are to the Government Code unless indicated otherwise.

Plaintiff developers are Garrick Development Company, Modern Home Development Co., Westbrook Housing Group and AJS Partners.

BACKGROUND

The fees in this case were imposed by the district under then-recent enabling legislation adding sections 53080 and 65995, which authorized imposing fees up to a maximum of $1.50 per square foot of new residential development. "Enacted in 1986, the two statutes authorize school districts to require their local city and county governments to impose school facilities fees as a condition to granting a building permit. (Stats. 1986, ch. 887.) Earlier legislation had merely allowed school districts to transmit findings to the city council or board of supervisors that could provide a legal basis for the local government itself to impose the fees. (Gov. Code, [ch.] 4.7, tit. 7, div. 1, commencing with Gov. Code, § 65970 et seq.)" (*Balch Enterprises, Inc.* v. *New Haven Unified School Dist.* (1990) 219 Cal.App.3d 783, 788 [268 Cal. Rptr. 543] (*Balch*).)[2]

The legislation took effect in January 1987 (Stats. 1986, ch. 887, § 14, p. 3087), and the board in September of that year adopted Resolution No. 8788-15, imposing a maximum school facilities fee of $1.50 per square foot on new residential construction.[3]

---

[2]In 1988, when most of the fees at issue here were paid, the statutes read in pertinent part as follows:

"65995. (a) Except for a dedication or fee, or both, required under Section 53080, or pursuant to Chapter 4.7 (commencing with Section 65970), no fee, charge, dedication, or other form of requirement shall be levied by the legislative body of a local agency against a development project . . . for the construction or reconstruction of school facilities.

"(b) In no event shall the amount of any fee, charge, dedication, or other form of requirement, as described in subdivision (a), including the amount of fees to be paid or the value of land to be dedicated, or both, under Chapter 4.7 (commencing with Section 65970), exceed the following:

"(1) One dollar and fifty cents ($1.50) per square foot of habitable space, in the case of any residential development. . . ." (Stats. 1988, ch. 29, § 3, pp. 193-194.)

"53080. (a) The governing board of any school district is authorized to levy a fee, charge, dedication, or other form of requirement against any development project . . . within the boundaries of the district, for the purpose of funding the construction or reconstruction of school facilities, subject to any limitations set forth in Chapter 4.9 (commencing with Section 65995) of Division 1 of Title 7. . . .

"(b) No city or county, whether general law or chartered, may issue a building permit for any development absent certification by the appropriate school district of compliance by that development project with any fee, charge, dedication, or other form of requirement levied by the governing board of that school district pursuant to subdivision (a).

". . . . . . . . . . . . . . . . . . . . . . . . . . ."
(Stats. 1988, ch. 29, § 2, p. 193.)

[3]The resolution recites the following findings supporting the action:

"1. The [HUSD] is overcrowded in that the present enrollment of students in all of the District's facilities when combined with the projected enrollment from proposed development exceeds the current capacity of the District's facilities;

HUSD operated twenty-three elementary schools, four intermediate schools (grades seven and eight) and five high schools (one a continuation school), and had not previously gotten development fees through either the City of Hayward or the County of Alameda. A history of declining enrollment in prior decades had reversed, bringing increases since 1984, particularly in the elementary grades. In response to capacity enrollment in some schools and projections of still greater enrollment, the district had acquired portable classrooms and set them up at existing elementary school sites, at costs of up to $50,000 ($80,000 for double units) each. Some elementary schools, or parts of them, were sold or leased in the 1970's, and one sale closed as late as March 1987. Increased enrollment in the higher grades was not yet a problem but would be. The board, based partly on seismic safety and other concerns unrelated to enrollment, ultimately voted in November 1988 to close Sunset High School (see *Citizen Action to Serve All Students* v. *Thornley* (1990) 222 Cal.App.3d 748 [272 Cal.Rptr. 83]), although the school apparently remained open at the time of the litigation below.

In preparation for the fees resolution, the board in early 1987 commissioned private consultant Gordon G. Getchel of Urbanplan to do a study of projected new school facility needs for the HUSD based on anticipated residential and commercial/ industrial development. Getchel in April submitted a study, "AB 2926 Development Fee Implementation Study" (hereafter Urbanplan report). Anticipating school facility costs of $2.97 per square foot of new residential development over the next 20 years, the report concluded:

"2. Unless certain District facilities are rehabilitated through reconstruction, they will soon be unusable which will render the District further overcrowded or will force the elimination of certain programs;

"3. Construction of additional facilities or placement of relocatable classrooms in the District may be necessary;

"4. The District lacks sufficient funds to pay the matching share requirement specified in Education Code section 17705.5 without the imposition of the maximum allowable school facility fees;

"5. The actual cost of constructing school facilities and reconstructing existing school facilities exceeds the limitations contained in Government Code sections 58080 and 65995;

"6. New commercial and industrial development will impact the District in that parents who work in the District but reside outside the District may send their children to schools operated by the District;

"7. New commercial and industrial development will additionally impact the District by creating additional jobs which in turn will cause potential District parents to relocate within the [HUSD] thereby generating additional children in the schools operated by the District;

"8. [HUSD] is overcrowded in that the actual cost of providing needed school facilities exceeds the total amount of the fees to be levied;

"Now THEREFORE BE IT RESOLVED, that the [HUSD] shall levy a fee of $1.50 per square foot of residential, covered or enclosed construction in compliance with the law and $ .25 per square foot of industrial and commercial, covered or enclosed construction in compliance with the law effective 60 days from the date of this Resolution."

"The total amount of fees estimated to be collected from residential projects during the timeframe of this study does not exceed the cost of providing adequate school facilities to the students generated by those projects. Also the cost per square foot of residential development for providing those same facilities exceeds the maximum [$1.50-per-square-foot] fee allowable in all density categories."[4]

The Urbanplan report was among the materials made available at two public hearings specially held that summer to receive community input on the proposed resolution. (Former § 54992 [see now § 66016, subd. (a), fn. 6, *post*].) The board adopted its resolution (No. 8788-15) on September 14, 1987.

Plaintiff developers paid the fees at issue here under protest in 1988 and 1989. Most fees were paid in 1988 under the 1987 resolution. A second resolution (No. 8889-23), adopted by the board in late 1988, was in effect when the 1989 fees were paid. It was passed in anticipation of statutory amendments (Stats. 1987, ch. 927) which would be operative in January 1989 and which appeared to specify more particular findings than the prior law.[5]

Plaintiffs filed separate suits in superior court, each seeking writ of mandate. The court ordered the actions consolidated and, treating each as

---

[4]Relevant findings included these: "Over the next twenty years there will be approximately 16,400 dwelling units developed within the District in several different density categories (Table A).

"The residents of these new dwelling units will generate from .57 to .19 K-12 students per household depending on the density category (Table B).

"It will cost approximately $10,480 per K-6 student, $12,580 per 7-8 student, and $14,130 per 9-12 student to adequately house the students generated from this development.

"The District will collect approximately $31,500,000 in fees during the next twenty years from residential development and have to provide space worth approximately $61,800,000 (Table G).

"The average cost per square foot of residential development to provide adequate educational facilities will be $2.97 (Table H)."

In an August 1987 revision to the report, Getchel eliminated certain land acquisition costs which the board informed him would not be a factor. He stood by his original overall cost figure, however, having since learned that his initial *construction* cost estimates were about 15 percent below those determined for a neighboring school district.

[5]Section 66001, added by the new legislation and amended before the operative date (see Stats. 1988, ch. 418, § 8, pp. 1789-1790), provides in part:

"(a)  In any action establishing, increasing, or imposing a fee as a condition of approval of a development project by a local agency on or after January 1, 1989, the local agency shall do all of the following:

"(1)  Identify the purpose of the fee.

"(2)  Identify the use to which the fee is to be put. If the use is financing public facilities, the facilities shall be identified. That identification may, but need not, be made by reference to a capital improvement plan as specified in Section 65403 or 66002, may be made in

seeking traditional mandate (Code Civ. Proc., § 1085), denied relief in a written statement of decision and judgment. Plaintiffs timely appeal.

APPEAL

I

■   One issue debated below was whether imposition of the fees was reviewable under traditional mandate (Code Civ. Proc., § 1085) or instead administrative mandate (*id.*, § 1094.5). The court below applied the former, and the parties appear to agree now in principle that this was correct. We concur.

Reviewing fees levied for *commercial* and *industrial* development under the same statutory scheme involved here, the Court of Appeal in *Balch, supra,* 219 Cal.App.3d 783, reasoned: "Administrative [mandate] . . . is available only to review adjudicatory decisions of government agencies. [Citation.] Since the school board's decision to impose the

applicable general or specific plan requirements, or may be made in other public documents that identify the public facilities for which the fee is charged.

"(3)   Determine how there is a reasonable relationship between the fee's use and the type of development project on which the fee is imposed.

"(4)   Determine how there is a reasonable relationship between the need for the public facility and the type of development project on which the fee is imposed.

"(b)   In any action imposing a fee as a condition of approval of a development project by a local agency on or after January 1, 1989, the local agency shall determine how there is a reasonable relationship between the amount of the fee and the cost of the public facility or portion of the public facility attributable to the development on which the fee is imposed.

"(c)   Upon receipt of a fee subject to this section, the local agency shall deposit, invest, account for, and expend the fees pursuant to Section 66006 [separate capital facilities account or fund required].

"(d)   The local agency shall make findings once each fiscal year with respect to any portion of the fee remaining unexpended or uncommitted in its account five or more years after deposit of the fee to identify the purpose to which the fee is to be put and to demonstrate a reasonable relationship between the fee and the purpose for which it was charged. . . .

"(e)   Except as provided in subdivision (f) [administrative costs of refunding exceed amount to be refunded], the local agency shall refund to the then current record owner or owners of lots or units of the development project or projects on a prorated basis the unexpended or uncommitted portion of the fee, and any interest accrued thereon, for which need cannot be demonstrated pursuant to subdivision (d). . . ."

The board's 1988 resolution, adopted after a public hearing and the consideration of new data, identifies in part: "a need for new school construction and reconstruction which shall be the purpose of the fee"; "the uses as to which the fee will be put"; "a reasonable relationship between the construction and reconstruction of school facilities and residential . . . construction in that such school construction will house new students generated by residential . . . construction"; and "a reasonable relationship between the need for the school construction and reconstruction and residential . . . development because such development will generate numbers of new students who will necessitate the construction and/or reconstruction of school facilities . . . ."

development fees applied generally to all future commercial and industrial development within its jurisdiction, the decision had a legislative rather than adjudicatory character. . . . Moreover, [Code of Civil Procedure] section 1094.5 is restricted to agency decisions made in proceedings involving (a) a hearing, (b) presentation of evidence, and (c) findings of fact." (*Id.*, at p. 791.) The scheme (§§ 54995, 53080) does not provide for a hearing or the presentation of evidence, and the mere fact that required "findings" are made does not render the action adjudicatory for these purposes. " 'Although the statutory obligation to make a "finding" is a characteristic shared with adjudicatory proceedings, it does not stamp the function with an adjudicative character.' [Citation.]" (*Balch, supra*, at p. 791.)

Thus the action imposing school facilities fees is quasi-legislative and reviewed under the narrower standards of ordinary mandate (Code Civ. Proc., § 1085). We determine only whether the action taken was arbitrary, capricious or entirely lacking in evidentiary support, or whether it failed to conform to procedures required by law. Such limited review is grounded on the doctrine of separation of powers which (1) sanctions the legislative delegation of authority to the agency and (2) acknowledges the presumed expertise of the agency. (*Balch, supra*, 219 Cal.App.3d 783, 791-792.) The inquiry into arbitrariness or capriciousness is like substantial evidence review in that both require a *reasonable basis* for the decision. (*Id.*, at p. 792.) "Nevertheless, precedents drawn from administrative mandamus proceedings should probably still be applied with caution to the review of findings in a quasi-legislative context. Procedural or evidentiary requirements drawn from analogy to judicial proceedings would appear peculiarly inappropriate . . . ." (*Ibid.*; see also *Friends of La Vina* v. *County of Los Angeles* (1991) 232 Cal.App.3d 1446, 1456-1457 [284 Cal.Rptr. 171].)

We examine in that context then a host of statutory and constitutional appeal arguments premised in part on claims that required "findings" and supporting evidence were lacking.

## II

One such "finding" is of state constitutional impact and flows from section 50076. To avoid being deemed a "special tax" requiring two-thirds voter approval under Proposition 13 (Cal. Const., art. XIII A, § 4), a fee must be one "which does not exceed the reasonable cost of providing the service or regulatory activity for which the fee is charged and which is not levied for general revenue purposes" (§ 50076). This need for a "reasonable" relation between cost and fee was echoed at all relevant times below in subdivision

(a) of former section 54992 (now § 66016), which stated in part that, unless voter approval had been obtained, "no local agency shall levy a new fee . . . [in] an amount which exceeds the estimated amount required to provide the service for which the fee . . . is levied. . . ."[6] (Stats. 1982, ch. 289, § 3, pp. 928-929.)

Thus the fee resolution had to rest on some determination that the fees to be imposed would not exceed the *reasonable (or estimated)* cost of the service to be provided, and a burden was expressly cast on the district to produce evidence on point if the fee were challenged. Subdivision (a) of former section 50076.5 provided that in any judicial action challenging the imposition of any development fee as "a special tax within the meaning of Section 50076, the city, county, or district has the burden of producing evidence to establish that the development fee does not exceed the cost of the service, facility, or regulatory activity for which it is imposed." (See now § 66024, subd. (a).) Plaintiffs challenged the fees in part as a special tax, but the court below concluded from the evidence that they were reasonable in that they did not exceed the reasonable cost of the service for which they were imposed.

Plaintiffs now challenge that conclusion through a confluence of related arguments, but to no avail. First, they argue that much of the evidence presented by the district below as having influenced the board's decision (on both resolutions) cannot be considered because it was not *furnished to them* before the public hearings. ■ They say that they asked, under former section 54992 (now § 66016, subd. (a)), for copies of "all documents" justifying fees imposition but were provided with "copies" of only the August 1987 Urbanplan report and (evidently before the *second* resolution)

---

[6]The statute has not changed in any way material to this case. Section 66016, a successor statute to section 54992, reads in pertinent part:

"(a)   Prior to levying a new fee . . . , a local agency shall hold at least one public meeting, at which oral or written presentations can be made . . . . Notice of the time and place of the meeting, including a general explanation of the matter to be considered, and a statement that the data required by this section is available, shall be mailed at least 14 days prior to the meeting to any interested party who files a written request . . . . At least 10 days prior to the meeting, the local agency shall make available to the public data indicating the amount of cost, or estimated cost, required to provide the service for which the fee . . . is levied and the revenue sources anticipated to provide the service, including General Fund revenues. Unless there has been voter approval, as prescribed by Section 66013 or 66014, no local agency shall levy a new fee . . . [in] an amount which exceeds the estimated amount required to provide the service for which the fee . . . is levied. If, however, the fees . . . create revenues in excess of actual cost, those revenues shall be used to reduce the fee . . . creating the excess."

"(b)   Any action by a local agency to levy a new fee . . . shall be taken only by ordinance or resolution.

"·  ·  ·  ·  ·  ·  ·  ·  ·  ·  ·  ·  ·  ·  ·  ·  ·  ·  ·  ·  ·  ·  ·  ·  ·  ·  ·"

an April 1988 report, "Schools for the Nineties," written by District Super-intendent Joel C. Thornley. We are urged that to consider any further evidence would violate both (1) the notice statute and (2) case law disallow-ing after-the-fact use of evidence not actually considered in decisionmaking proceedings.

Neither point has merit. The statute is procedural, requiring a public hearing. Interested parties who have made a written request get 14 days advance mailed notice of the time, place, subject matter and the availability of "data required" by the section, meaning "data indicating the amount of cost, or estimated cost, required to provide the service for which the fee . . . is levied and the revenue sources anticipated to provide the service . . . ." Notice aside, that data must be made "available to the public" 10 days before the hearing. (§ 66016, subd. (a); fn. 6, *ante*.)

Plaintiffs say they were given "copies" of the Thornley and Urbanplan reports. The statute, however, only required the district to make relevant data "available" for public inspection and to notify requesting parties, like plain-tiffs, of that *availability*. To the extent, then, that plaintiffs complain of failure to *physically provide them* with further materials, they have no argument. The district's director of planning declared below, without dis-pute, that those further materials had "at all times been . . . available to the public." The fact that they were not produced at the hearings or mailed to plaintiffs does not appear to violate the statute. We therefore need not decide whether such a violation—which in essence affects only how *informed* the public is when giving input to a school district's decisionmaking process—should bar a court from considering all data actually affecting the decision.

Plaintiffs' reliance on case law is flawed, too. The Supreme Court in *Laurel Heights Improvement Assn.* v. *Regents of University of California* (1988) 47 Cal.3d 376 [253 Cal.Rptr. 426, 764 P.2d 278], rejected the idea of *post*approval environmental review of projects as "*post hoc* rationalizations to support action already taken" (*id.*, at p. 394), but here the board properly considered its data *before* the time of decision. The record was not, as plaintiffs urge, "contrived" after litigation had commenced. Further, in a case like this, which is governed by traditional rather than administrative man-date, it does not matter that not all data came out at a particular hearing. "Whereas in administrative mandamus the evidence is generally con-fined to the administrative record (see Code Civ. Proc., § 1094.5, subd. (e)), in cases subject to traditional mandamus . . . additional relevant evidence may be introduced for consideration. [Citations.]" (*Friends of La Vina* v. *County of Los Angeles, supra*, 232 Cal.App.3d 1446, 1457.) Therefore, our

review for substantial evidence obliges us to consider all data considered by the board which was also introduced in the court below, whether or not it was presented at public hearings. (Cf. *No Oil, Inc.* v. *City of Los Angeles* (1974) 13 Cal.3d 68, 79, fn. 6 [118 Cal.Rptr. 34, 529 P.2d 66]; compare *Shapell Industries, Inc.* v. *Governing Board* (1991) 1 Cal.App.4th 218, 233-234 [1 Cal.Rptr.2d 818] [reports prepared after agency action are not properly considered].)

■ Like the court below, we find support in the record for a determination that the fees imposed under the resolution do not exceed the reasonable cost of the facilities provided by them and that the fees therefore do not constitute an invalid "special tax" enacted without voter approval.

Plaintiffs' argument to the contrary hangs in part on a faulty perception that the law required, as support for projected "costs," some *specific plans* for new school facilities. They point to a letter from consultant Getchel, who in response to concerns voiced at the August 1987 public hearing (which he had attended) wrote that, while there was no express requirement in the new legislation, it had been "accepted practice pursuant to other provisions of the Government Code" to develop a list or description of specific projects, along with their costs and approximate completion schedules. Getchel correctly noted, however, that there was no express requirement in these statutes for that information (fns. 2 & 6, *ante*) and, in fact, advised in the same letter that the board should consult legal counsel on the need for it. Even the later-enacted requirement of current section 66001, subdivision (a)(2) (discussed in pt. III, *post*) would not require a specific "capital improvement plan" (fn. 5, *ante*).

Nor, despite plaintiffs' urging, did case law require a specific building proposal. The court in *Beaumont Investors* v. *Beaumont-Cherry Valley Water Dist.* (1985) 165 Cal.App.3d 227 [211 Cal.Rptr. 567], invalidated a water facilities fee, imposed on new development, as a special tax where relevant data (most of it not in the trial record) failed to reasonably allocate improvement costs among new users or, evidently, to show needs or costs adequately. (*Id.*, at pp. 236-238.) The court in *Bixel Associates* v. *City of Los Angeles* (1989) 216 Cal.App.3d 1208 [265 Cal.Rptr. 347], likewise invalidated a fire hydrant/water main fee imposed on new development. The scheme there took a percentage of new construction *value* as reflected in building permits, without tying it to actual needs generated by the projects, and did not limit the use of fees so collected to offsetting new, as opposed to preexisting, citywide costs. (*Id.*, at pp. 1219-1220; cf. *Shapell Industries, Inc.* v. *Governing Board, supra*, 1 Cal.App.4th 218, 236, 244-245 [failure to allocate total increase between new and existing development].)

The scheme here suffers from none of those defects. The data (which all appear in the trial record) identify the increased enrollment and attendant new school construction costs attributable solely to new residential development. It accounts for varying density ranges (units per acre) of new development. Population figures are based in part on projections by ABAG (the Association of Bay Area Governments). Development trends are based in part on building permit activity, the City of Hayward's general plan, the availability of developable land, and higher development costs and density trends to be expected as that land becomes scarcer. New enrollment and facility construction costs are broken down into elementary, middle and high school figures. Data show the district's elementary and middle schools already operating at or near capacity, with portable classrooms having been added in recent years. Fees are ultimately tied to newly developed square footage (as dictated by statute) rather than to housing value or some other less reliable indicator of increased student populations.

Evidence of this sort meets case law requirements (see, e.g., *Russ Bldg. Partnership* v. *City and County of San Francisco* (1987) 199 Cal.App.3d 1496, 1505-1506, 1511 [246 Cal.Rptr. 21]) without the need to show specific construction plans. The statute's goal is to ensure a *reasonable relationship* between the fees to be charged and the estimated cost of services, and the data here show that facilities fees of $1.50 a square foot will generate only *half* of the new school construction costs attributable to new residential development. In other words, the amount of the fee comes nowhere near exceeding the costs. With such a wide margin of error, we do not see what would be gained by having concrete construction plans to consider. Plaintiffs, in fact, do not say how actual plans might have altered, for example, the Urbanplan report's cost projections. Their concern seems to be that fees will be collected and then not used for actual school construction. That concern, however, is addressed *elsewhere* in the statutory scheme. Subdivisions (c) through (e) of section 66001 require that collected fees be kept segregated from other funds; unexpended fees are accounted for yearly; if a use for them cannot be shown, they are refunded pro rata with interest. (Fn. 5, *ante.*) With that ongoing mechanism in place to guard against unjustified fee retention, there is no reason to think that the Legislature meant to require school boards to make a concrete showing of all projected construction when initially adopting a resolution. The resolution might be in effect for decades. We cannot imagine the Legislature wanting a board to have decades of concrete plans in hand. "All that is required . . . is that it demonstrate that development contributes to the need for the facilities, and that its choices as to what will adequately accommodate the influx of students are reasonably based. [Citations.]" (*Shapell Industries, Inc.* v. *Governing Board, supra,* 1 Cal.App.4th 218, 239.)

Plaintiffs offer some specific criticisms of the Urbanplan report. Bearing in mind that we review the record only to ensure that it provides a reasonable basis *overall* for the board's action, we find that none of these criticisms, individually or together, seriously undermine the action.

One criticism is that the report's projections are based on a 20-year time frame, assertedly "arbitrary" because 20 years is too long a period to yield accurate results. It is no doubt true, as testimony below showed, that accurate projections become more difficult when long time frames are used, but this does not make the use of 20 years "arbitrary" in a legal sense. Testimony shows that the 20-year time frame was one used in ABAG figures which in turn fed the Urbanplan report. We note that the use of a 45-year time frame to calculate public transit fees has been upheld as "not arbitrary or unreasonable" (*Russ Bldg. Partnership* v. *City and County of San Francisco, supra,* 199 Cal.App.3d 1496, 1509). As was said in that case and is even more true of a 20-year term, "we cannot state that such long term forecasts are inherently unreliable or are so arbitrary as to be mere speculation." (*Id.,* at pp. 1511-1512.)

Plaintiffs criticize the Urbanplan report for its exclusive focus on permanent construction as opposed to less costly, movable structures. They note that the district had in recent years relied solely on the latter to fill its overflow needs. There is no flaw. The choice between permanent and movable facilities, we think, is a legislative one whose wisdom we cannot second guess. (*Terminal Plaza Corp.* v. *City and County of San Francisco* (1986) 177 Cal.App.3d 892, 912 [223 Cal.Rptr. 379].) Even if we could, the choice made here seems reasonable. A school district does not have to mitigate fee impacts by erecting only movable structures, and the fact that only movable structures were added in recent years does not change our view. Evidence shows that it takes about five years, from initial planning to occupancy, to build a new school, and increased enrollment had been a fairly new phenomenon in the district. With long-term projections now showing a steady increase in student enrollment, the board could reasonably conclude that new *permanent* schools were finally justified.

A related argument is that the Urbanplan report failed to provide data on *existing* enrollment or capacities, but this argument flows apparently from plaintiffs' misconception that our review is limited to data provided at the public hearings. Other data available to the board, including yearly facilities reports, gave that information.

Plaintiffs fault the report for failing to include "site-specific" data showing a "close connection" between new development and the fees to be imposed.

However, their citation to "taking" cases shows that they are blurring legal principles (see pt. IV, *post*). The fee at issue here is a general one applied to all new residential development and valid if supported by a reasonable relationship between the amount of the fee and estimated cost of services. Site-specific review is neither available nor needed. (*Shapell Industries, Inc.* v. *Governing Board, supra*, 1 Cal.App.4th 218, 239.)

We reject out of hand plaintiffs' attack on claimed "weaknesses and gaps in the data collection process" used for the Urbanplan report. Rather than brief those arguments, they purport to "incorporate" them from papers filed below. We do not consider such arguments on appeal. (*Balesteri* v. *Holler* (1978) 87 Cal.App.3d 717, 720-721 [151 Cal.Rptr. 229].)

The record provides a reasonable basis for upholding the school facilities fee as reasonably related to the cost of facilities. The fees are not a prohibited "special tax."

III

Because plaintiff Garrick Development Company paid some of its challenged fees in 1989, after the effective date of section 66001 (fn. 5, *ante*), we address that statutory change and the 1988 resolution passed to comply with it.

A school district is a "local agency" within the meaning of the statute. (§ 66000, subd. (c).) Subdivision (a) of section 66001 provides that "[i]n any action establishing, increasing, or imposing a fee as a condition of approval of a development project by a local agency," the agency must identify the *purpose* of the fee (subd. (a)(1)) and the *use* to which it is to be put (subd. (a)(2)). It must also determine "how there is a reasonable relationship between the fee's use and the type of development project" on which it is imposed (subd. (a)(3)) and between "the need for the public facility and the type of development project" on which it is imposed (subd. (a)(4)).

These requirements appear to expand slightly on the reasonable relationship test previously used by courts to test quasi-legislative action like the board's in this case. Having the use and purpose of the fee identified, the agency has to find a "reasonable relationship" between the "type" of project and both the fee's use and the need for the facility. In our case, the type of project (residential development) had to bear a reasonable relationship to the need for the facility and the use to which the fee would be put.

The resolution imposes a fee of $1.53 per square foot (see inflation adjustment in former and current § 65995, subd. (b)(3)) and identifies as its

purpose "new school construction and reconstruction" attributable to residential development. Plaintiffs take issue with language in the prior, superseded resolution about "rehabilitation through reconstruction" (fn. 3, *ante*), claiming that "rehabilitation" does nothing to increase capacity, but they offer no argument against the new language, which simply tracks the statutes (§§ 65995, subd. (a), 53080, subd. (a)).[7]

Uses for the fees are identified by reference to a "report" denoted "Exhibit A," which we presume is the Urbanplan report (fn. 4, *ante*). We have rejected plaintiffs' argument that any concrete construction plans were necessary to support estimated "costs," and no such specificity is apparently needed to show "uses" under section 66001. The section specifically rejects the need for a capital improvement plan, allowing the showing to be made from "general *or* specific plan" requirements (italics ours) or other "public documents that identify the public facilities" (§ 66001, subd. (a)(2); fn. 5, *ante*.) That language does not connote site-specific plans for school construction—certainly not at the initial adoption stage of a resolution which might remain in effect for decades.

The resolution finally reflects, by reference to the exhibit report "and other relevant information considered" by the board, determinations that a reasonable relationship exists between the type of development (residential) and the fee need and uses (§ 66001, subds. (a)(3), (a)(4)). The relationship for both need and use is because new residential development "will generate numbers of new students" who will attend the schools (fn. 5, *ante*). We see no flaw in those findings and ample support for them in the total information considered by the board. (Cf. *Balch, supra*, 219 Cal.App.3d 783, 793.)

Plaintiffs rely on section 66001 for their view that site-specific information must be present. The fact that subdivision (a) speaks of a relationship between the use and need on one hand and the "type" of development on the other, however, defeats any argument that some nexus must be found between the fee and a *particular* project on which it is imposed. The subdivision clearly applies to decisions to impose fees on a *class* of development projects rather than particular ones.

Some support for plaintiffs' position might appear from subdivision (*b*) of section 66001, which states: "In any action imposing a fee as a condition of

---

[7] Plaintiffs attack findings in the 1987 resolution (fn. 3, *ante*), but that resolution was adopted at a time when the sole "finding" needed was the "reasonable relationship" between fees and costs already discussed. Incidental unrelated "findings" in that resolution appear to be superfluous and unnecessary to review. Oddly, plaintiffs devote almost no attention to the superseding 1988 findings, made under the new, more demanding statute.

approval . . . , the local agency shall determine how there is a reasonable relationship between the amount of the fee and the cost of the public facility or portion of the public facility attributable to the development on which the fee is imposed." (Fn. 5, *ante*.) ■ However, we concur in the position of the district and court below—that subdivision (b) does not apply in this case.

Subdivisions (a) and (b) describe different stages of a fee imposition process. Subdivision (a)—which speaks of use and need in relation to a "type" of development project and of agency action "establishing, increasing, or imposing" fees—applies to an initial, quasi-legislative adoption of development fees. Subdivision (b)—which speaks of "imposing" fees and of a reasonable relationship between the "amount" of a fee and the "cost of the public facility or portion of [it] attributable to the development on which the fee is imposed"—applies to adjudicatory, case-by-case actions. Only at that stage could a local agency know how much of a public facility's cost (or some portion of it) is attributable to "the development" as opposed to a "type" of development. Giving the subdivisions this interpretation also reconciles why both apply to actions "imposing" fees. If subdivision (b) applied to quasi-legislative action, as plaintiffs would have it, then its reasonable-relationship requirement could have been added to those in subdivision (a). Moreover, as a practical matter, determining subdivision (b)'s reasonable relationship between "amount" and a particular development at the quasi-legislative stage would be imprecise at best. Plaintiffs' construction of both subdivisions as applying to quasi-legislative action could also leave a local agency without legislative guidance on what kind of "reasonable relationship" to look for when relevant statutes call for an adjudicatory stage of the approval process.

Section 66001 governs a wide range of local agency actions taken under differing statutory requirements. Some call for adjudicatory findings and some do not. For example, where a district imposes fees on a commercial or industrial development project, a statute requires, beyond the initial resolution-stage findings, "findings on either an individual project basis or on the basis of categories of commercial or industrial development" (§ 53080.1, subd. (e)(1)(A)) and a chance for the developer to appeal the decision (*id.*, subd. (e)(2)). Second-stage findings are also required when school facilities fees are imposed on a greenhouse (§ 53080.15).

No second-stage action is prescribed for fees imposed on *residential* projects like the ones at issue here (§ 53080). The Legislature was apparently satisfied that a need for new school facilities based generally on projected new residential development was nexus enough as a matter of law, without a

need for case-by-case adjudication, so long as fees did not exceed the prescribed maximum rate. It deemed the yearly accounting and refund mechanisms of section 66001, subdivisions (d) and (e) (fn. 5, *ante*), adequate protection against abuse, mismanagement and changed needs. That being so, the board was not required to make findings under subdivision (b) of section 66001. Its findings under section 66001, subdivision (a) were adequate and supported.

## IV

Plaintiffs raise several constitutional arguments, none of which have merit.

### Taking

Their "taking" claim rests on *Nollan* v. *California Coastal Comm'n* (1987) 483 U.S. 825 [97 L.Ed.2d 677, 107 S.Ct. 3141] (*Nollan*), in which the high court rejected, as violating the Fifth Amendment's prohibition against taking without just compensation, a permit condition requiring beachfront lot owners to provide a public access easement across their lot. The condition failed to " 'substantially advance' " asserted legitimate state interests (protecting public view of the beach, overcoming a psychological barrier to its use and preventing congestion) (*id.*, at pp. 834-835 [97 L.Ed.2d at pp. 687-688]) because there was an insufficient "nexus" (*id.*, at p. 837 [97 L.Ed.2d at p. 689]) shown between the condition and those interests (*id.*, at pp. 838-839 [97 L.Ed.2d at pp. 690-691]).

Such a nexus, if required here (but see *Casella* v. *City of Morgan Hill* (1991) 230 Cal.App.3d 43, 56-57 [280 Cal.Rptr. 876] [rejecting strict standard of *Nollan* in a case of mobilehome rent control], review den. July 17, 1991; *Terminal Plaza Corp.* v. *City and County of San Francisco, supra*, 177 Cal.App.3d 892, 911-912 [ordinance involved only economic use, not a physical invasion]), adequately appears. Constitutional propriety disappears when a condition "utterly fails to further the end advanced" (*Nollan, supra*, 483 U.S. at p. 837 [97 L.Ed.2d at p. 689]), but there is a clear and close connection between fees imposed for school facilities and new residential construction, the most predictable single source of increased school enrollment. Plaintiffs have never sought in this litigation to show that their projects would *not* bring new students into the HUSD. Nor have they sought to show that the amount of the fees imposed denied them an economically viable use of their land. (*Casella* v. *City of Morgan Hill, supra*, 230 Cal.App.3d 43, 57-58.)

No Fifth Amendment taking is shown, and no separate analysis is offered under the parallel state protection (Cal. Const., art. I, § 19).

### Equal protection

■ The imposition of school facility fees being an instance of economic regulation, we review it under " 'the basic and conventional standard,' which 'invests legislation . . . with a presumption of constitutionality and "requir[es] merely that distinctions drawn by a challenged [measure] bear some rational relationship to a conceivable legitimate state purpose." ' . . . [W]e may not review the challenged local measure under any stricter standard: developers do not constitute a 'suspect class,' and development is not a 'fundamental interest' [citation]. Under the conventional standard, 'the burden of demonstrating the invalidity of a classification . . . rests squarely upon *the party who assails it.*' [Citation.]" (*Candid Enterprises, Inc.* v. *Grossmont Union High School Dist.* (1985) 39 Cal.3d 878, 890 [218 Cal.Rptr. 303, 705 P.2d 876].) Plaintiffs do not even try to meet that burden. Moreover, "if developers currently building in the district are treated differently, such difference is reasonable and therefore lawful: developers who are expected to cause or aggravate overcrowding are required to mitigate it, others are not." (*Id.*, at p. 891; *Russ Bldg. Partnership* v. *City and County of San Francisco, supra*, 199 Cal.App.3d 1496, 1507-1508.)

### Substantive due process

■ "A law regulating or limiting the use of real property for the public welfare does not violate substantive due process as long as it is reasonably related to the accomplishment of a legitimate governmental interest. [Citation.]" (*Terminal Plaza Corp.* v. *City and County of San Francisco, supra*, 177 Cal.App.3d 892, 908.) The resolutions in this case easily meet that test; their provisions are far from arbitrary, unreasonable or lacking a substantial relation to the public welfare. (*Ibid.*; *Russ Bldg. Partnership* v. *City and County of San Francisco, supra*, 199 Cal.App.3d 1496, 1508-1509.) Also, because no fundamental right or protected personal interest is implicated, heightened scrutiny is again not available. (*Terminal Plaza Corp.* v. *City and County of San Francisco, supra*, 177 Cal.App.3d at p. 908.)

### *"Equal educational opportunity"**

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante*, page 320.

## DISPOSITION

The judgment is affirmed.

Kline, P. J., and Peterson, J., concurred.

A petition for a rehearing was denied March 2, 1992, and appellants' petition for review by the Supreme Court was denied April 23, 1992.