[No. A055667. First Dist., Div. One. Mar. 18, 1993.]

CITY OF DUBLIN, Plaintiff and Respondent, v.
COUNTY OF ALAMEDA et al., Defendants, Cross-defendants and
Respondents;
CITY OF PLEASANTON et al., Defendants, Cross-complainants and
Respondents;
SIERRA CLUB et al., Defendants and Appellants.

COUNSEL

Manuela Albuquerque, City Attorney, Jylana Collins, Deputy City Attorney, Deborah S. Reames and Laurens H. Silver for Defendants and Appellants.

Louise H. Renne, City Attorney, (San Francisco), Elaine C. Warren and Noreen Ambrose, Deputy City Attorneys, Sedgwick, Detert, Moran & Arnold, Sean H. Gallagher, Daniel Frankston and Lynda D. Williams as Amici Curiae on behalf of Defendants and Appellants.

Elizabeth H. Silver, City Attorney, Meyers, Nave, Riback & Silver, and Andrea J. Saltzman for Plaintiff and Respondent.

Michael H. Roush, City Attorney, for Defendants, Cross-complainants and Respondents.

No appearance for Defendants, Cross-defendants and Respondents.

OPINION

STRANKMAN, P. J.—Voters in Alameda County (the County) approved by majority vote an initiative measure adding the Alameda County Waste

Reduction and Recycling Act of 1990 (Measure D) to the County charter. The trial court granted a petition for writ of mandate invalidating Measure D on several grounds: (1) a surcharge on waste disposal imposed by the initiative is a special tax which required a two-thirds vote according to article XIII A, section 4 of the California Constitution; (2) Measure D conflicts with the California Integrated Waste Management Act of 1989 (the Act) (Pub. Resources Code, § 40000 et seq.) in several respects and is therefore preempted; (3) the Act precludes local action by initiative; and (4) Measure D conflicts with a joint powers agreement entered into by the County and its cities and sanitary districts.[1]

We conclude that the court erred. Except for an overinclusive definition, which is severable, Measure D is a valid exercise of the initiative power, and its surcharge is not a special tax.

### FACTS AND PROCEDURAL BACKGROUND

#### A. *The Act*

The Act is prefaced with a declaration of legislative findings, including that the "amount of solid waste generated in the state coupled with diminishing landfill space and potential adverse environmental impacts from landfilling constitutes an urgent need for state and local agencies to enact and implement an aggressive new integrated waste management program." (§ 40000, subd. (d).)[2]

The Act's stated purposes are "to reduce, recycle, and reuse solid waste . . . to the maximum extent feasible to conserve water, energy and other natural resources, to protect air and water quality, to improve regulation of existing solid waste landfills, to ensure that new solid waste landfills are environmentally sound, to improve permitting procedures for solid waste management facilities, and *to specify the responsibilities of local governments to develop and implement integrated waste management programs.*" (§ 40052, italics added.) The Act explicitly contemplates state and local cooperation, describing solid waste management as a "shared responsibility between the state and local governments." (§ 40001.)

Cities and counties have detailed statutory obligations which must be satisfied within specified time limits. The Act sets ambitious waste reduction

---

[1] Unless otherwise indicated, all statutory references are to the Public Resources Code.

[2] The Legislature also found that in 1988, Californians disposed of over 38 million tons of solid waste, or more than 1,500 pounds per person living in the state, and that over 90 percent of that solid waste is currently disposed of in landfills, some of which present a threat to groundwater, air quality, and public health. (§ 40000, subds. (a), (b).)

goals; cities and counties must divert 25 percent of all solid waste from landfills and transformation facilities through source reduction, recycling, and composting activities by January 1, 1995, and 50 percent by January 1, 2000.[3] (§ 41780, subd. (a).) To accomplish those goals, each city must prepare and adopt a "source reduction and recycling element" (SRRE), a plan for the management and reduction of solid waste; each county must prepare a similar county SRRE for its unincorporated area. (§§ 41000, 41300.)

Each SRRE must include components on waste characterization, source reduction, recycling, composting, solid waste facility capacity, education and public information, funding, and special waste. (§§ 41003, 41030-41260.) Each SRRE must also be "consistent with the waste management hierarchy" provided by the Act, i.e., source reduction first, then recycling and composting, followed by environmentally safe transformation and land disposal, "at the discretion of the city or county." (§§ 41001, 41301, 40051, subd. (a).) The city and county SRRE's must be incorporated by each county into a "countywide integrated waste management plan" (countywide plan), which must also include city and county hazardous waste elements and a countywide siting element. (§§ 41750, 41791.)

The Act includes several provisions on funding. Each city or county must demonstrate funding sources available to pay for preparing, adopting, and implementing its SRRE or plan; projected costs, revenues, and revenue sources must be identified in the SRRE funding component. (§§ 41900, 41230, 41430.) A city or county "may impose fees in amounts sufficient to pay the costs of preparing, adopting, and implementing an integrated waste management plan" prepared pursuant to the Act. In determining the amounts of the fees, a city or county "shall include only those costs directly related to the preparation, adoption, and implementation of the plan and the setting and collection of the local fees." (§ 41901.)

To carry out the state's responsibility to oversee the design and implementation of local plans, the Act establishes the California Integrated Waste Management Board (the Board). (§§ 40001, 40400 et seq.) Among its duties, the Board must review and approve or disapprove city and county SRRE's and countywide plans. The Act establishes deadlines for submission of SRRE's and countywide plans to the Board, depending on the local entity's remaining landfill capacity. (§§ 40400, 41790, 41791, 41800.) Failure to submit an adequate or timely plan may result in the imposition of substantial fines. (§§ 41810-41813.)

---

[3]"Transformation" includes "incineration, pyrolysis, distillation, gasification, or biological conversion other than composting." (§ 40201.)

At the same time that the Act imposes statutory obligations on cities and counties, it also explicitly recognizes their reserved powers. According to section 40059, "Notwithstanding any other provision of law, each county, city, district, or other local governmental agency may determine . . . [a]*spects of solid waste handling which are of local concern, including,* but not limited to, frequency of collection, means of collection and transportation, level of services, *charges and fees, and nature, location, and extent of providing solid waste handling services.* [(Italics added.)]"[4] A city or county is not prohibited from "implementing source reduction, recycling, and composting activities designed to exceed" the minimum goals set by the Act. (§ 41780, subd. (b).) Section 41792 communicates the urgency of the state's solid waste problems; it provides, "It is the intent of the Legislature, in enacting this part, that cities and counties shall commence efforts to implement source reduction, recycling, or composting activities immediately upon enactment of this part, in order to achieve the deadlines specified under this chapter."

The Act is supplemented with administrative regulations which have been promulgated by the Board. (See Cal. Code Regs., tit. 14, § 18720 et seq.)

### B. *Measure D*

Measure D, which added section 64 to the County's charter, was approved by majority vote in November 1990. Its stated purposes include providing for an Alameda County Source Reduction and Recycling Plan (the Recycling Plan) "in conformance with new state law," meeting state-mandated refuse reduction goals, and setting "longer-term goals starting at seventy-five percent." (Measure D, County charter § 64.020.)

The Recycling Plan is to include several essential programs: a countywide source reduction program to minimize the generation of refuse, residential and commercial recycling programs, and recycled product market development and purchase preference programs. (Measure D, County charter, § 64.020.) Administration and coordination of the Recycling Plan is to be carried out by an 11-member appointed board, the Alameda County Source Reduction and Recycling Board (the local board). (Measure D, County charter, § 64.130.)

---

[4]"Solid waste handling" is broadly defined to mean "the collection, transportation, storage, transfer, or processing of solid wastes." (§ 40195.) "[S]olid waste handling services" include but are not limited to "source reduction, recycling, composting activities, and the collection, transfer, and disposal of solid waste within or without the territory subject to its solid waste handling jurisdiction." (§ 40057.)

The Recycling Plan is to be funded from a recycling fund created by a $6 per ton surcharge on materials deposited in County landfills.[5] (Measure D, County charter, §§ 64.020D, 64.050A-E.) For approximately two years, 80 percent of recycling fund moneys are to be disbursed to municipalities within the County for planning, implementation, or expansion of residential and commercial recycling programs and for preparation of city SRRE's under the Act; the remainder is to be used for development of the other programs, the Board's administrative expenses, and preparation of the County's SRRE. Thereafter, half the funds are to be disbursed on a per capita basis to cities for recycling programs; the remaining funds are to be applied to a grant program for nonprofit organizations engaged in maximizing recycling, composting, and reducing waste within the County, the source reduction program, the recycled products programs, and otherwise in the local board's discretion. (Measure D, County charter, § 64.060A, B.)

To be eligible for recycling fund moneys, cities must provide full reimbursement to local refuse haulers for the surcharge, either by adjusting local collection rates or by a product disposal fee. (Measure D, County charter, § 64.070.) Within two years, cities receiving recycling fund moneys must provide residential and commercial recycling programs. (Measure D, County charter, §§ 64.090, 64.100.)

Finally, Measure D prohibits the operation of incinerators within the County. (Measure D, County charter, § 64.140.)

C. *The Lawsuit*

The City of Dublin (Dublin), a municipal corporation, filed a petition for writ of mandate and complaint for declaratory and injunctive relief, attacking Measure D on several grounds. Named as defendants were the County and several of its officials, the Alameda County Waste Management Authority (the Authority), and others, including "all persons interested in the matter of [the] validity" of Measure D.[6]

The County opposed the petition and supported Measure D, joined by the City of Berkeley (Berkeley), the Sierra Club, and the Alameda County Recycling Initiative Steering Committee (the Recycling Committee), who answered as interested parties. The City of Pleasanton (Pleasanton) and the Oro Loma Sanitary District answered as interested parties opposed to the

---

[5]As will be discussed, *post*, Measure D defines the County as "the geographic entity, including both the incorporated and unincorporated areas." (Measure D, County charter, § 64.150B.)

[6]The Authority was established in 1990 by a joint powers agreement for waste management entered into by the County, its cities, and two sanitary districts. The Authority was delegated the power to prepare, adopt, revise, amend, administer and enforce the County Integrated Waste Management Plan pursuant to the Act.

initiative and cross-complained to invalidate it. The Authority answered but took a neutral position.

The trial court invalidated Measure D on several grounds: (1) the surcharge is a special tax which required a two-thirds vote; (2) Measure D conflicts with the Act in several respects and is therefore preempted; (3) the Act precludes local action on solid waste management by initiative; and (4) Measure D conflicts with the joint powers agreement.

Judgment was entered granting the petition and prohibiting the County from implementing Measure D, and this appeal followed. Appellants are Berkeley, the Sierra Club, and the Recycling Committee; the County has not appealed. Respondents are Dublin and Pleasanton. Pursuant to a stipulation, the County has agreed not to collect the surcharge pending this appeal. Amicus curiae briefs have been filed in support of appellants by the City and County of San Francisco and several organizations.

DISCUSSION

A. *Conflict With Powers of Cities*

Respondents contend that Measure D is invalid in that it infringes on the powers of cities within the County.[7] We consider this issue first because its resolution will affect the meaning and scope of Measure D and, as a consequence, will have some bearing on the remaining issues.

Courts have repeatedly emphasized that the initiative power is among the most precious rights of our democratic process. Whenever the initiative power is challenged, any reasonable doubts must be resolved in favor of its exercise. (*Kennedy Wholesale, Inc.* v. *State Bd. of Equalization* (1991) 53 Cal.3d 245, 250 [279 Cal.Rptr. 325, 806 P.2d 1360]; *Building Industry Assn.* v. *City of Camarillo* (1986) 41 Cal.3d 810, 821 [226 Cal.Rptr. 81, 718 P.2d 68].) Nevertheless, local ordinances and other legislation enacted by initiative are subject to the same constitutional limitations and rules of construction applicable to other statutes. (*Lesher Communications, Inc.* v. *City of Walnut Creek* (1990) 52 Cal.3d 531, 540 [277 Cal.Rptr. 1, 802 P.2d 317].)

Measure D defines the County as "the geographic entity, including both the incorporated and unincorporated areas." (Measure D, County charter, § 64.150B.) However, the California Constitution specifies that the police power bestowed upon a county may be exercised "within its limits,"

---

[7]Although respondents raised this issue below, the trial court did not address the argument in its statement of decision.

i.e., only in the unincorporated area of the county. (Cal. Const., art. XI, § 7; *Stirling* v. *Board of Supervisors* (1975) 48 Cal.App.3d 184, 187 [121 Cal.Rptr. 435]; *City of South San Francisco* v. *Berry* (1953) 120 Cal.App.2d 252, 253 [260 P.2d 1045].) Appellants concede that to the extent Measure D appears to require incorporated cities to impose a surcharge on landfills located within their jurisdiction, bans incineration within city limits, and establishes waste reduction goals for cities in excess of those mandated by the Act, the measure does impermissibly infringe on city autonomy. Appellants claim that the initiative has not been so interpreted in practice, but suggest severance of the reference to incorporated areas from the definition to remedy any uncertainty.

Measure D does include a severance clause (Measure D, County charter, § 64.190), but severance would be permissible even absent that clause provided the invalid provision is grammatically, functionally, and volitionally separable. (*Legislature* v. *Eu* (1991) 54 Cal.3d 492, 535 [286 Cal.Rptr. 283, 816 P.2d 1309].) Those conditions are satisfied here. The reference to incorporated areas may be grammatically excised from the definition, and severance would not impair operation of the rest of the measure. Finally, Measure D probably would have been adopted even if the voters had foreseen the success of respondents' challenge on this ground. (See *Raven* v. *Deukmejian* (1990) 52 Cal.3d 336, 356 [276 Cal.Rptr. 326, 801 P.2d 1077].)

Respondents insist that the surcharge in the unincorporated areas also infringes on the powers of cities because that surcharge will indirectly be imposed on city ratepayers. The contention is without merit, as the County's authority to set fees for disposal in landfills within its own jurisdiction is beyond dispute. (See § 40059.)

B. *Preemption*

Next, we consider whether Measure D, as severed, is preempted by the Act.

Counties and cities may make and enforce within their limits "all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." (Cal. Const., art. XI, § 7; *People* ex rel. *Deukmejian* v. *County of Mendocino* (1984) 36 Cal.3d 476, 483-484 [204 Cal.Rptr. 897, 683 P.2d 1150] (*Mendocino*).) It has long been recognized that this power includes the authority to enact ordinances providing for the collection and disposal of garbage. (See, e.g., *Anaheim City School Dist.* v. *County of Orange* (1985) 164 Cal.App.3d 697, 699-700 [210 Cal.Rptr. 722]; *Silver* v. *City of Los Angeles* (1963) 217 Cal.App.2d 134, 138-139 [31 Cal.Rptr. 545].)

■ Nevertheless, local ordinances which conflict with general law are void. A conflict is present if the local legislation duplicates, contradicts, or enters an area fully occupied by general law, either expressly or by implication. To determine whether the Legislature has preempted or fully occupied a subject area by implication, courts must examine the whole purpose and scope of the legislative scheme. Preemption by implication occurs if the subject is so completely covered by general law that it clearly has become exclusively a matter of state concern. Preemption by implication also occurs if the subject has only been partially covered by general law, but is phrased in terms indicating that a paramount state concern will not tolerate additional local action.[8] Supplementary or complementary local legislation is not permitted, even if the subject is otherwise properly characterized as a municipal matter. (*Mendocino, supra*, 36 Cal.3d at pp. 484-485.)

But preemption by implication may not be found when the Legislature has expressed its intent to allow local regulations or when the statutory scheme recognizes local regulations. "An expressed intent to allow local regulation, or an express recognition of local regulation, is convincing evidence that the state legislative scheme was not intended to occupy the field." (*IT Corp.* v. *Solano County Bd. of Supervisors* (1991) 1 Cal.4th 81, 94, & fn. 10 [2 Cal.Rptr.2d 513, 820 P.2d 1023]; *Mendocino, supra*, 36 Cal.3d at p. 485.) Even if a legislative scheme is detailed and extensive, if it purports only to set minimum standards and implies no general purpose to deprive local entities of their traditional powers, preemption by implication will also not be found. (*IT Corp., supra*, at p. 95.)

■ The trial court concluded that Measure D both directly conflicts with and partially duplicates the Act and is therefore preempted. Focusing on the initiative's call for immediate development of a Recycling Plan and imposition of a surcharge, the court reasoned that Measure D bypasses the Act's measured planning processes, thereby creating a conflict. Respondents add that by emphasizing recycling, Measure D conflicts with the Act's hierarchy of waste management program priorities, which gives top rank to source reduction. (§ 40051.)

The short answer to these concerns is that although Measure D mentions conformance with the Act as part of its purpose, the initiative does not purport to create or establish the countywide plan which is mandated under the Act; that plan remains to be developed. While it is true that any existing

[8]There is a third test for implied preemption, i.e., the subject has been partially covered by general law and is such that the adverse effect of a local ordinance on the state's transient citizens outweighs the possible benefit to the municipality. (*Mendocino, supra*, 36 Cal.3d at p. 485.) That test is not relevant here.

Measure D programs will have to be taken into account by the drafters of SRRE's and the countywide plan, the Act neither expressly nor impliedly prohibits implementation of new programs before completion of either the SRRE's or the countywide plan; nor does it invalidate existing programs. On the contrary, section 41792 of the Act impliedly refutes any notion that all action in pursuit of the Act's goals and deadlines must await completion of the planning and review process; that section instead recognizes the need for expeditious action by directing cities and counties to "commence efforts to implement source reduction, recycling, or composting activities *immediately* upon enactment of this part, in order to achieve the deadlines specified under this chapter." (§ 41792, italics added.)

The administrative regulations adopted to implement the Act also specifically contemplate that there will be existing programs which SRRE's must take into account. For instance, each component of a SRRE must include discussion of the consistency of each diversion alternative with "applicable local policies, plans, and ordinances based upon local conditions." (Cal. Code Regs., tit. 14, § 18733.3, subd. (b)(1).) Other regulations also require planners to take into account existing activities. (See, e.g., Cal. Code Regs., tit. 14, §§ 18733.4, 18734.2, subd. (a), 18735.2.) In sum, the possibility that Measure D programs may be implemented before the countywide plan is drafted, submitted, and approved under the Act does not create a conflict resulting in preemption.

The court also believed that Measure D's creation of a local board to oversee its Recycling Plan at least partially duplicates the Act's requirement for a local "task force."[9] That concern is misplaced. Measure D does direct the County's board of supervisors to seek consent of a double majority of the cities for the local board to serve as the task force mandated by the Act; it also provides that if the local board is not named as the task force, the local board "shall review any recommendations of a local task force regarding source reduction and recycling." (Measure D, County charter, § 64.130.) Nevertheless, Measure D does not attempt to endow the local board with any authority over the recommendations of the task force; thus despite this potential for some duplication of effort, no conflict resulting in preemption exists.

For similar reasons, there is no merit to respondents' contention that Measure D is preempted because it usurps the supervisory role of the Board

[9]Under the Act, a county is to convene a "task force" to assist in coordinating the development of city SRRE's, the county SRRE, and to assist in preparation of the countywide siting element. The task force's responsibilities include identifying solid waste management issues of countywide or regional concern and facilitating, to the extent possible, resolution of conflicts between or among city SRRE's, and developing policies, goals, and procedures consistent with guidelines and regulations adopted by the Board. (§ 40950.)

over waste management programs. The Board reviews SRRE's and county-wide plans to determine their compliance with the Act; it will also conduct subsequent reviews at regular intervals to assess each jurisdiction's progress toward meeting the mandated diversion requirements, and has authority to impose fines for noncompliance. (§ 41790 et seq.; Cal. Code Regs., tit. 14, §§ 18760, 18785, 18787.) Measure D simply does not claim to invest the local board with any such authority.[10]

■ The trial court also identified Measure D's outright ban on inciner-ators as in direct conflict with the Act. Because we have already concluded that the Act is invalid to the extent that it bans incinerators within city limits, the more narrow question is whether a direct conflict results from the ban on that method of transformation in the unincorporated areas of the County.

*Northern Cal. Psychiatric Society* v. *City of Berkeley* (1986) 178 Cal.App.3d 90 [223 Cal.Rptr. 609] is instructive on this question. That case involved an initiative prohibiting and criminalizing electric shock treatment within the city. The local ordinance was preempted because it directly conflicted with state law both authorizing the administration of the treatment when stringent procedural requisites are satisfied and protecting the right of psychiatric patients to elect that treatment. (*Id.*, at pp. 102-106.)

Nothing analogous concerning incineration appears in the Act. It does not compel cities or counties to allow incineration, conditionally or otherwise; on the contrary, several sections of the Act demonstrate that the decision to permit or disallow incineration is a matter for the discretion of each city or county. For example, "[e]nvironmentally safe transformation and environ-mentally safe land disposal" are last in the Act's priority list of waste management practices, and are to be promoted "*at the discretion of the city or county.*" (§ 40051, subd. (a)(3), italics added.) A county preparing its coun-tywide siting element may choose to meet its needs through landfilling *or* transformation methods. (§§ 41700, 41701.) Section 41783 sets several con-ditions and limits on source reduction through transformation for SRRE's submitted after January 1, 1995; section 41784 specifies that if the Board determines that a city or county will not meet its reduction requirement and the local agency chooses not to use a transformation project, the Board shall not require diversion through transformation or impose any penalty to force that choice. As the Act permits but does not require the use of transforma-tion, including incineration, the ban imposed by Measure D does not create a conflict with the state law.

---

[10]The trial court also concluded that the surcharge authorized by Measure D conflicts with section 41901, which requires fees enacted to include only those costs directly related to the preparation, adoption, and implementation of an integrated waste management plan under the Act. The trial court stated that Measure D's surcharge was in conflict with the Act for "the reasons listed in the special tax analysis." However, as we will discuss later in this opinion, the court's special tax analysis was flawed.

■ Respondents' contention that Measure D is impliedly preempted because the Act leaves no room for further or complementary local action is equally unavailing. The Act proclaims that waste management is a "shared responsibility between the state and local governments." (§ 40001.) As we have already discussed, the Act does specify certain responsibilities and minimum goals for cities and counties. But it also explicitly allows the setting of goals in excess of those minimums and recognizes the powers of cities and counties to determine aspects of solid waste handling which are of local concern, including the nature and extent of providing solid waste handling services and the setting of charges and fees. This expressed intent to allow local regulation is "convincing evidence that the state legislative scheme was not intended to occupy the field." (*IT Corp.* v. *Solano County Bd. of Supervisors, supra,* 1 Cal.4th at p. 94, fn. 10.)

## C. *Local Action by Initiative*

■ The trial court also invalidated Measure D on the alternative ground that the Act foreclosed local action by initiative.

■ As we have discussed, the Legislature may choose to preempt an entire field to the exclusion of all local control. But if it decides instead to authorize some degree of local action and autonomy, it may impose procedural restrictions on the exercise of the power granted, and may bar the exercise of the initiative and referendum. (*Committee of Seven Thousand* v. *Superior Court* (1988) 45 Cal.3d 491, 511 [247 Cal.Rptr. 362, 754 P.2d 708] (*Committee*).) Reasoning that initiative and referendum powers apply only to legislative acts, courts in the past have begun their analysis with an attempt to determine whether the delegated powers were legislative or administrative. (See, e.g., *Yost* v. *Thomas* (1984) 36 Cal.3d 561, 569-572 [205 Cal.Rptr. 801, 685 P.2d 1152].) But the Supreme Court has since discarded that test as an "unnecessary fiction" and held that the proper analysis rests on the exact language and subject matter of the statute, as well as its history. (*Committee, supra,* 45 Cal.3d at pp. 509, 511.)

The term "governing body" has been construed to exclude the electorate. (*Building Industry Assn.* v. *City of Camarillo, supra,* 41 Cal.3d at p. 818.) According to the court in *Committee,* a generic statutory reference to action by a local "legislative body" or "governing body" supports a weak inference that the Legislature intended to preclude action on the same subject by the electorate. In contrast, a strong inference that action by initiative is foreclosed arises from use of specific terms such as "board of supervisors" or "city council." (*Committee, supra,* 45 Cal.3d at pp. 501-505.)

■ Here, the Act avoids the specific terms and only occasionally uses the generic. Instead, it refers both to "local governments" and to "local

agencies." (§§ 40001, 40052, 40002.) When enumerating local responsibilities, the Act for the most part either mandates or permits action by the local entity itself, i.e., the "city" or "county" or "local agency," rather than its legislative body. (See, e.g., §§ 41000 ["each city shall prepare . . ."], 41750 [each "county shall prepare . . ."], 40057, 40059 ["county, city, district, or other local governmental agency . . ."], 41901 ["city, county, or city and county may impose fees . . ."], 41902 ["local agency may directly collect the fees . . ."].) No legislative intent to preclude action by the electorate is perceptible in most of the Act's provisions.

An exception in one provision is particularly telling and reinforces the conclusion that there was no blanket intent to ban initiative action. ██ When a statute contains a particular provision, the omission of that provision from similar statutes on the same or a related subject reveals a different intent. (*Committee, supra*, 45 Cal.3d at p. 507.) ██ Section 40059 permits each "county, city, district, or other local governmental agency" to determine aspects of solid waste handling services which are of local concern; it then specifies that the authority to provide such services may be granted under terms and conditions prescribed by "*the governing body of the local governmental agency* by resolution or ordinance. [(Italics added.)]"[11] Here, the explicit reference to the "governing body" in section 40059 and its omission from the Act's other provisions suggests that the Legislature intended to preclude action by the electorate only when it specifically conferred authority to act on the "governing body" of the agency, but not otherwise.

The nature of the Act's subject matter bolsters that interpretation of legislative intent. Courts will more readily infer legislative intent to exclude ballot measures if the statute deals with matters of primarily statewide or regional impact. (*Committee, supra*, 45 Cal.3d at pp. 505-507.) Here, however, the Act concerns matters of both statewide and local significance. It expresses the need for a comprehensive program for solid waste management and sets waste reduction goals for cities and counties; at the same time, it also emphasizes local discretion in developing programs and acknowledges that many aspects of solid waste handling are of local concern. We find no support for the trial court's conclusion that the Act precludes action by the electorate.

D. *Special Tax*

██ Article XIII A, section 4 of the California Constitution, enacted in June 1978 as part of Proposition 13, provides in relevant part that cities and

---

[11]"Local governing body" is defined elsewhere in the Act as "the legislative body of the city, county, or special district . . . ." (§ 40150.)

counties may impose "special taxes" by a two-thirds vote of their qualified electors.[12] Although the section uses permissive language, the supermajority voter approval requirement was intended to restrict the taxing power of local government. (*Rider* v. *County of San Diego* (1991) 1 Cal.4th 1, 5-6 [2 Cal.Rptr.2d 490, 820 P.2d 1000].) A special tax, for purposes of that provision, is a tax levied to fund a specific governmental project or program. (*Id.*, at p. 15.) As with any tax, a special tax may be imposed upon individuals who will enjoy no peculiar benefit from its expenditure and who are not responsible for the condition to be corrected. (*Knox* v. *City of Orland* (1992) 4 Cal.4th 132, 142 [14 Cal.Rptr.2d 159, 841 P.2d 144].)

Special taxes must be distinguished from regulatory fees imposed under the police power, which are not subject to the constitutional provision. (*Pennell* v. *City of San Jose* (1986) 42 Cal.3d 365, 374-375 [228 Cal.Rptr. 726, 721 P.2d 1111].) Special taxes do not encompass fees charged to particular individuals in connection with regulatory activities or services when those fees do not exceed the reasonable cost of providing the service or activity for which the fee is charged, and are not levied for unrelated revenue purposes. (Gov. Code, § 50076; *Pennell* v. *City of San Jose, supra*, at p. 375 [fee on rental units to defray costs of administrative hearing process under rent control ordinance]; *United Business Com.* v. *City of San Diego* (1979) 91 Cal.App.3d 156, 164-165 [154 Cal.Rptr. 263] [fee on existing signs to recover costs of administering sign control ordinance]; *Mills* v. *County of Trinity* (1980) 108 Cal.App.3d 656, 660-663 [166 Cal.Rptr. 674] [fee for processing various land-use applications].)

According to the trial court, it was undisputed that Measure D fees were not levied for general revenue purposes; thus the critical inquiry was the fee-cost ratio. The court concluded that Measure D was an improper special tax. First, it reasoned that because local government has the burden to prove the applicability of the special tax exception, at least some showing of the framework for establishing the fee cost relationship should have appeared in the initiative measure itself or in the voters' pamphlet.

It is true that when a fee-for-services ordinance or resolution is challenged as a special tax, the burden is on the local agency to produce evidence in support of its determination that those fees will not exceed the reasonable cost of the service to be provided. (*Garrick Development Co.* v. *Hayward Unified School Dist.* (1992) 3 Cal.App.4th 320, 329-330 [4 Cal.Rptr.2d 897];

[12]Article XIII A, section 4 states: "Cities, counties and special districts, by a two-thirds vote of the qualified electors of such district, may impose special taxes on such district, except ad valorem taxes on real property or a transaction tax or sales tax on the sale of real property within such City, County or special district."

see *Beaumont Investors* v. *Beaumont-Cherry Valley Water Dist.* (1985) 165 Cal.App.3d 227, 235-238 [211 Cal.Rptr. 567].) Courts have looked to a variety of evidence in determining whether the agency has satisfied that burden, not all of it prepared before the adoption of the ordinance. (See, e.g., *Russ Bldg. Partnership* v. *City and County of San Francisco* (1987) 199 Cal.App.3d 1496, 1503, fn. 2 [246 Cal.Rptr. 21] [transit impact development fee reasonably related to the services provided; evidence includes report prepared for trial]; *United Business Com.* v. *City of San Diego, supra,* 91 Cal.App.3d at p. 166 [inventory fee ordinance upheld, based in part on a report dated after its adoption]; but see *Shapell Industries, Inc.* v. *Governing Board* (1991) 1 Cal.App.4th 218, 233-234 [1 Cal.Rptr.2d 818] [report prepared after school board resolution imposing development fee should not have been considered by trial court; error harmless].)

But even if a school board or city council were not permitted to rely on after-the-fact evidence to defend its fee ordinance, the trial court's imposition of such a limitation on the initiative measure here is contrary to law. Procedural requirements which a city council or county board of supervisors must satisfy before enacting legislation generally do not apply to the enactment of similar legislation by initiative. (See, e.g., *Building Industry Assn.* v. *City of Camarillo, supra,* 41 Cal.3d at pp. 823-824 [statutory requirement for balancing housing and public service needs and making findings justifying reduced housing opportunities when enacting growth control ordinance inapplicable to initiative measures]; *Associated Home Builders etc., Inc.* v. *City of Livermore* (1976) 18 Cal.3d 582, 594-595 [135 Cal.Rptr. 41, 557 P.2d 473, 92 A.L.R.3d 1038] [notice and hearing provisions of zoning law inapplicable to zoning ordinances enacted by initiative].) " '[W]hat was in the minds of the electorate in adopting the initiative is . . . immaterial.' " (*Camarillo, supra,* at p. 824.) Instead, an initiative measure ordinarily must be deemed to have been enacted on the basis of any state of facts supporting it that reasonably can be conceived. (*Birkenfeld* v. *City of Berkeley* (1976) 17 Cal.3d 129, 145 [130 Cal.Rptr. 465, 550 P.2d 1001].) The trial court's conclusion that the voters were not provided with sufficient factual information on how the surcharge was calculated is simply irreconcilable with the foregoing authority and cannot be sustained.

■ Thus the question here is not what the voters knew, but whether the evidence before the trial court established that the proposed surcharge does not exceed the reasonably necessary costs of the programs it will fund. Answering that question necessitates a consideration of both the estimated costs of the programs and the basis for determining the apportionment of those costs. Assessment of the latter factor assures that the allowed charges bear a fair or reasonable relationship to the payor's burdens on or benefits

from the regulatory activity. (*San Diego Gas & Electric Co.* v. *San Diego County Air Pollution Control Dist.* (1988) 203 Cal.App.3d 1132, 1146 [250 Cal.Rptr. 420]; *Beaumont Investors* v. *Beaumont-Cherry Valley Water Dist., supra,* 165 Cal.App.3d at pp. 234-235.) For example, fees imposed on developers must be based on the cost of increased services made necessary by the development. (*Garrick Development Co.* v. *Hayward Unified School Dist., supra,* 3 Cal.App.4th at pp. 324-334 [school facilities fees]; *Shapell Industries, Inc.* v. *Governing Board, supra,* 1 Cal.App.4th at pp. 234-235 [school facilities fees]; *Bixel Associates* v. *City of Los Angeles* (1989) 216 Cal.App.3d 1208, 1218-1220 [265 Cal.Rptr. 347] [fire hydrant fees].)

The trial court concluded that the requisite fee-cost relationship was not established because Measure D's programs are not yet developed and their costs cannot presently be calculated with certainty, but such specificity is not required. Instead, the record need only demonstrate a reasonable relationship between the fees to be charged and the *estimated* cost of the service or program to be provided; that requirement may be satisfied by evidence showing only that the fees will generate substantially less than the antici-pated costs. (*Garrick Development Co.* v. *Hayward Unified School Dist., supra,* 3 Cal.App.4th at pp. 331-334 [school facilities fee imposed on developers not an invalid special tax; evidence shows that fees will generate only half of anticipated new construction costs attributable to new residential development; concrete plans not required]; see also *Pennell* v. *City of San Jose, supra,* 42 Cal.3d at pp. 374-375 [rental unit fee imposed on landlords under rent dispute mediation ordinance does not exceed sum reasonably necessary to cover costs of regulatory purpose and is clearly a regulatory fee, not a special tax].)

The evidence before the trial court included the declaration of Steve W. Brekke-Brownell, a member of the Measure D steering committee. Accord-ing to that declaration, the surcharge amount was based on: (1) information and analysis, including program cost estimates, in the 1987-1988 Alameda County Resource Recovery and Recycling Plan (the 87-88 Plan), adjusted to account for two or three years' inflation; and (2) the "collective experience and expertise" of the Measure D steering committee in knowing how much recycling programs cost. The 87-88 Plan, which was also before the trial court, is a comprehensive document prepared for the Alameda County Solid Waste Management Authority to provide information on possible three-phase implementation of a countywide recycling plan; Brekke-Brownell was its co-author.

Based on then-current and projected solid waste disposed of in County landfills, it was estimated at trial that the $6 per ton surcharge would raise

approximately $12 million per year.[13] Brekke-Brownell's declaration alone would not be sufficient to establish that the surcharge will generate less revenue than the programs it is intended to fund, as highest projected annual program cost in the 87-88 Plan was only $3,646,205, and Brekke-Brownell does not provide any explanation of how the inflation adjustment was calculated.

But the Measure D Recycling Plan is far more expansive and has higher goals than the 87-88 Plan, which aimed at only a 20 percent reduction. Respondents themselves acknowledge this difference; they note that the surcharge is designed to fund a variety of programs and services, while the 87-88 Plan provided an analysis of only one recycling program. Given its expanded scope, the Measure D programs will inevitably be more costly. Additional support for this conclusion appears in the declaration of James D. Liljenwall, recycling program manager for the Department of Public Works of Berkeley. Liljenwall estimated that the operating and administration costs of Berkeley's recycling programs for the fiscal year 1991-1992 would be approximately $2,184,098, and that Berkeley's revenue under Measure D for that same fiscal year would only be approximately $800,000.

Considered in its entirety, the evidence is sufficient to establish that the surcharge will generate substantially less than the estimated cost of the programs to be funded.

The last question is whether the charges allocated bear a fair or reasonable relationship to the payor's burdens on or benefits from the activity at issue. The overall goal of Measure D programs is reduction of the refuse landfilled in the County. Whether or not that goal is accomplished will have effects on the maintenance, operation, and longevity of the existing landfills, as well as on the need to develop new sites. The surcharge is directly related to the burdens imposed by the payors on the landfills; it is imposed on waste haulers based on tonnage, and will be passed on to those who generate the waste in the form of increased garbage collection rates. Thus the surcharge is intended to distribute the financial burden of source reduction in proportion to the contribution of each waste generator to the problem, and at the same time it provides incentives for the control and reduction of waste generation. That showing is adequate to establish the requisite reasonable relationship. (See *San Diego Gas & Electric Co.* v. *San Diego County Air Pollution Control Dist., supra,* 203 Cal.App.3d at p. 1148 [emissions-based fees are

---

[13]That estimate includes projected revenue from the Durham Road landfill, which is located within the City of Fremont. We have concluded that Measure D is invalid to the extent it requires cities to impose the surcharge on landfills within their jurisdiction; therefore, the revenue estimate is too high.

reasonably related to pollution control district's overall purpose of achieving and maintaining air quality standards].)

For the foregoing reasons, the trial court erred when it concluded that the surcharge was a special tax which required approval by two-thirds of the voters.[14]

## E. *Joint Powers Agreement*

We have already mentioned that in 1990, the County and its cities and two sanitary districts entered into a joint powers agreement pursuant to Government Code section 6500 et seq. The agreement created the Authority and delegated to it substantial responsibility for the preparation, adoption, and administration of the SRRE's and countywide plan required by the Act.

The trial court concluded that Measure D is inconsistent with the agreement in that only the Authority has the power within the County to impose the fees authorized by sections 41901 and 41902. We disagree. The Act does permit a county or other local entity to impose fees in amounts sufficient to pay the costs of preparing, adopting, and implementing an integrated waste management plan prepared pursuant to its requirements (§ 41901); it is true that the Authority has been delegated that power. But the Measure D surcharge is not the section 41901 fee; instead, it is intended primarily to support its own recycling programs and goals. That Measure D permits some limited use of Recycling Fund moneys to be distributed for preparation of city and county SRRE's does not transform the surcharge into the fees authorized by the Act or in some way undermine the Authority's power to impose section 41901 fees.[15]

---

[14]Our dissenting colleague correctly notes that the surcharge is to be imposed on all who choose to use the landfills in the County, not all of whom may be County residents or from cities in the County which elect to participate in recycling or other source reduction programs funded by the surcharge. But that fact does not establish that the charge is a special tax. Instead, as we have discussed, it means that the cost of the regulatory programs aimed at reducing the amount of waste dumped at landfills in the County has been fairly or reasonably distributed in proportion to the payor's burden on the landfills.

[15]We have not overlooked respondents' suggestion, raised for the first time in this appeal and relegated to a footnote, that Measure D may be invalid solely because it is a charter amendment. They theorize that because the California Constitution describes city and county charters differently, a complex program such as Measure D might properly be included only in a city charter. (Compare Cal. Const., art. XI, §§ 4, 5.) But we do not read the enumeration in article XI, section 4, of specific provisions which must appear in a county charter as precluding by implication all else. A charter county has all the powers provided by the Constitution and by statute for counties, including powers necessarily implied from those expressed. (Cal. Const., art. XI, § 4, subd. (h); Gov. Code, § 23303; *Younger v. Board of*

DISPOSITION

The judgment granting the petition for writ of mandate is reversed. The trial court is directed to enter a new judgment, granting the petition to the extent that it compels the County to sever any reference to incorporated areas from the definition of Alameda County in Measure D, section 64.150 B, and denying the petition in all other respects. The parties shall bear their own costs.

Dossee, J., concurred.

**STEIN, J.,** Dissenting.—Alameda County Waste Reduction and Recycling Act of 1990 (Measure D) imposes a $6 "surcharge" per ton of solid waste deposited in landfills located in Alameda County. The majority conclude that the surcharge is a valid regulatory fee. I believe the trial court properly found this surcharge to be a special tax imposed in violation of article XIII A, section 4 of the California Constitution.

A municipality has broad powers to enact regulations for a purpose reasonably related to promoting the public health, safety, comfort, and welfare, by means reasonably appropriate to the regulatory purposes which are not in conflict with general laws. (*Barry* v. *City of Oceanside* (1980) 107 Cal.App.3d 257, 261 [165 Cal. Rptr. 697], citing *Higgins* v. *City of Santa Monica* (1964) 62 Cal.2d 24, 30 [41 Cal.Rptr. 9, 396 P.2d 41]; and *Sunset Amusement Co.* v. *Board of Police Commissioners* (1972) 7 Cal.3d 64, 72 [101 Cal.Rptr. 768, 496 P.2d 840].) Sanitation, including waste disposal, is subject to local regulation, and it is within Alameda County's police power to address conservation of its landfill space. In the exercise of its police power, a municipality has the right to fix and collect reasonable regulatory charges in order to cover all direct and incidental costs attendant to its regulation. (*County of Plumas* v. *Wheeler* (1906) 149 Cal. 758, 764 [87 P. 909].) Such charges are exempt from the supermajority requirement of article XIII A, section 4. (*Pennell* v. *City of San Jose* (1986) 42 Cal.3d 365, 375 [228 Cal.Rptr. 726, 721 P.2d 1111].)

Such a surcharge, however, is a special tax when it is insufficiently related to accomplishing its purported regulatory purpose. The term "special tax" does not include "any fee which does not exceed the reasonable cost of providing the service or regulatory activity for which the fee is charged and which is not levied for general revenue purposes." (Gov. Code, § 50076.) A valid regulatory fee requires that the fee not "exceed the sum reasonably

---

*Supervisors* (1979) 93 Cal.App.3d 864, 868-871 [155 Cal.Rptr. 921].) What a county may not do is include in its charter an enactment in excess of those powers. (See *ibid.*)

necessary to cover the costs of the regulatory purpose sought." (*United Business Com.* v. *City of San Diego* (1979) 91 Cal.App.3d 156, 165 [154 Cal.Rptr. 263].)

Article XIII A, section 4, was not intended to be a "fiscal straightjacket" requiring a two-thirds vote for charges imposed where direct benefits are being conferred upon those being charged for the performance of proprietary functions. (*Mills* v. *County of Trinity* (1980) 108 Cal.App.3d 656, 660 [166 Cal.Rptr. 674].) However, if the public is asked to bear the cost of a benefit to a discrete group, it must agree by a two-thirds vote. (*Evans* v. *City of San Jose* (1992) 3 Cal.App.4th 728, 738 [4 Cal.Rptr.2d 601]; *Mills, supra,* at p. 663.) Similarly, a fee may be imposed upon those who place or increase a burden upon the local entity, and vicariously the general public, so as to offset the costs reasonably attributable to their actions. (*Shapell Industries, Inc.* v. *Governing Board* (1991) 1 Cal.App.4th 218, 234-235 [1 Cal.Rptr.2d 818]; see also *Trent Meredith, Inc.* v. *City of Oxnard* (1981) 114 Cal.App.3d 317, 325 [170 Cal.Rptr. 685]; *Bixel Associates* v. *City of Los Angeles* (1989) 216 Cal.App.3d 1208, 1211 [265 Cal.Rptr. 347]; *Terminal Plaza Corp.* v. *City and County of San Francisco* (1986) 177 Cal.App.3d 892, 906 [223 Cal.Rptr. 379].) However, if an imposed charge exceeds the reasonable relationship between the burdens imposed by the payor, then the charge operates as a special tax.[1] If an insufficient connection exists between the "regulatory fees" and the problem being addressed, the "fees" are special taxes. For example, a school facilities fee valid as to residential developers (*Trent Meredith, supra, passim*) is invalid as to commercial developers where no sufficient connection is shown to exist between their commercial construction and the need for additional school facilities. (*Shapell, supra,* at p. 240; *Bixel, supra,* at p. 1218.)

To determine whether the imposition of a tonnage-based surcharge upon those disposing of solid waste in landfills located in Alameda County deters or reduces the excessive generation of waste so as to conserve landfill space, we must analyze the use of the fee involved (*Mills* v. *County of Trinity, supra,* 108 Cal.App.3d at p. 661; *United Business Com.* v. *City of San Diego, supra,* 91 Cal.App.3d at p. 165). " 'If revenue is the primary purpose and regulation is merely incidental the imposition is a tax; while if regulation is the primary purpose the mere fact that incidentally a revenue is also obtained

---

[1]Consequently, most regulatory fees imposed according to payors' burdens are limited to the actual operating costs of providing the service to the payors' themselves. For example, tonnage-based landfill gate fees are proper insofar as used to meet operating expenses of simply running landfills owned and operated by the County. (*Anaheim City School Dist.* v. *County of Orange* (1985) 164 Cal.App.3d 697, 688-689, 701 [210 Cal.Rptr. 722].) This is significantly different here, where the exactions are used to fund special programs serving individuals who are unrelated to the payors of the fee.

does not make the imposition a tax.' " (*City & County of San Francisco* v. *Boss* (1948) 83 Cal.App.2d 445, 450-451 [189 P.2d 32], cited with approval in *United Business Com., supra*, at p. 165.)

The overall regulatory purpose of Measure D is to deter and reduce the excessive generation of waste in order to conserve landfill space. The measure seeks to accomplish this purpose through conservation and waste reduction programs within the county funded by imposition of a surcharge on all who use landfills in the county. In its funding capacity, the surcharge is exacted on those disposing into Alameda County landfills solid waste from areas inside and outside of the county. The proceeds are used to fund programs to reduce excessive waste within the unincorporated areas of Alameda County and its eligible cities.

This surcharge is used to fund programs not reasonably related to conserving landfill space, because the programs it funds only address waste generated in Alameda County. The proportions of waste disposed of from areas in the county which are or are not eligible for program funding, and from areas outside the county, may change; however, the overall amount of waste disposed in the landfills will not necessarily be decreased. Since the proceeds from the surcharge are directed solely toward these programs, rather than used to directly address problems resulting from the waste disposed of by the intended payors, the use and the purpose of the surcharge is to exact revenue, not conserve landfill space. This makes the exaction serve as unrelated revenue not exempted from article XIII A by Government Code section 50076.

The surcharge might reduce landfill by increasing the cost of disposing of solid waste in landfills; i.e., it provides an economic disincentive to excessive generation and disposal of solid wastes above and beyond operating costs. However, if the nexus of cost benefit is met merely by making a disfavored act more expensive, then article XIII A offers illusory protection and Government Code section 50076 is a meaningless tautology. Moreover, as the trial court noted, the cost of the service regarding Government Code section 50076 correlates here not to the need for the funds generated per tonnage disposed based upon burdens actually imposed by the users, but rather correlates to programs to reduce excessive waste in Alameda County. Thus, the mere use of the landfill, rather than the excessive use, is what is being deterred. Consequently, I would hold that the trial court correctly found that the surcharge imposed by Measure D, however laudable a goal involved, is not entitled to exempt status as a regulatory fee.

Measure D's surcharge is a special tax. Although this suggests that its imposition violates article XIII A because it was not approved by two-thirds

of the electorate, only those special taxes falling within the intended reach of article XIII A require supermajority voter approval. (*Rider* v. *County of San Diego* (1991) 1 Cal.4th 1, 10 [2 Cal.Rptr.2d 490, 820 P.2d 1000].)

The supermajority limitations not only were placed upon the imposition of property-related taxes, but also upon the levy of "special taxes" so as to restrain the ability of local governments to recoup their losses from decreased property taxes by imposing or increasing levies on nonproperty taxes. (*Rider* v. *County of San Diego, supra*, 1 Cal.4th at p. 7; *Heckendorn* v. *City of San Marino* (1986) 42 Cal.3d 481, 488-489 [229 Cal.Rptr. 324, 723 P.2d 64].) "[T]he four sections of article XIII A are 'functionally related in furtherance of, a common underlying purpose, namely, effective real property tax relief' " (*City and County of San Francisco* v. *Farrell* (1982) 32 Cal.3d 47, 56 [184 Cal.Rptr. 713, 648 P.2d 935]) and also are designed to promote a broader objective, the curtailment of government spending. (*Terminal Plaza Corp.* v. *City and County of San Francisco* (1986) 177 Cal.App.3d 892, 906 [223 Cal.Rptr. 379]; see also *County of Fresno* v. *Malmstrom* (1979) 94 Cal.App.3d 974, 983-985 [156 Cal.Rptr. 777]; *Mills* v. *County of Trinity, supra*, 108 Cal.App.3d at p. 663.) Article XIII B, which acts in tandem with article XIII A, limits the growth of appropriations and requires excess proceeds from licenses or user fees over the reasonable cost of providing regulatory services be returned to the users. (Cal. Const., art. XIII B, § 2, subd. (b); *County of Fresno* v. *State of California* (1991) 53 Cal.3d 482, 486 [280 Cal.Rptr. 92, 808 P.2d 235]; *County of Placer* v. *Corin* (1980) 113 Cal.App.3d 443, 448, 451 [170 Cal.Rptr. 232]; *Mills, supra*, at p. 663.)

The proceeds generated by Measure D's surcharge go into the Alameda County Recycling Fund (Measure D, Alameda County Charter, § 64.050A) to be disbursed by the recycling board (Measure D, *id.*, § 64.060). Expenditures are based upon percentages of the total moneys collected. (Measure D, *id.*, § 64.060A and § 64.060B.) Not only does this financing scheme insure that no surplus could ever result, it makes the cost of the programs dependent on the amount of funds generated by the surcharge. Article XIII A requires that the surcharge be set at an amount reflecting the reasonable cost of providing the regulatory service. Furthermore, the surcharge may be increased in several ways, which do not require a supermajority vote. (Measure D, Alameda County Charter, § 64.050D ¶¶ 1, 2, 3, 4, 5.) These features indicate that the surcharge runs counter to articles XIII A's and XIII B's broad objectives to limit government taxation and spending. Subjecting Measure D to the supermajority voter approval is consonant with the objectives of article XIII A and, since it did not receive two-thirds voter approval, it is invalid if the surcharge is imposed by an entity restricted by section 4 of article XIII A.

Section 4 of article XIII A expressly restricts only counties, cities and special districts. Measure D was enacted by initiative and thus by the citizens of Alameda County. Ordinarily, initiatives require only majority approval for passage; however, the county exercises considerable control over the imposition of the surcharge and the use of the funds generated by it. The county is the sole body empowered to ensure the collection of said surcharge, either by modifying use permits of said landfills or "by any other means necessary." (Measure D, Alameda County Charter, § 64.050A.) Only the county has the power to raise the surcharge and may adjust it in accordance with the consumer price index. (Measure D, *id.*, § 64.050D ¶ 3.) Finally, only the county has the power to waive the surcharge. (Measure D, *id.*, § 64.050B.)

The power of the county to raise and waive the surcharge indicates that it is the county, not the recycling board, that has imposed this tax. Indeed, the recycling board's control over the surcharge is "purely administrative and managerial in nature. . . . It is at all times strictly tethered to its designated purpose: to spend certain amounts of money on projects dictated by the board of supervisors." (*Monterey Peninsula Taxpayers Assn.* v. *County of Monterey* (1992) 8 Cal.App.4th 1520, 1529 [11 Cal.Rptr.2d 188].) Since Alameda County controls the imposition of this special tax, and it is explicitly subject to article XIII A, section 4, I would hold the surcharge invalid because it did not receive supermajority voter approval.

A petition for a rehearing was denied April 19, 1993, and the petition of respondent City of Dublin for review by the Supreme Court was denied June 3, 1993.